# STATE OF NORTH CAROLINA

**MECKLENBURG** County

File No.
16-CVS- 7034

In the General Court of Justice
☐ District ☒ Superior Court Division

*Name of Plaintiffs*

CRYSTAL ESCHERT,

**VERSUS**

*Name of Defendants*

CITY OF CHARLOTTE.

2016 APR 15 PM 2:59

MECKLENBURG COUNTY. C.S.C.

BY_____

## APPLICATION AND ORDER EXTENDING TIME TO FILE COMPLAINT

G.S. 1A-1, Rule 3

| APPLICATION |
|---|

The undersigned requests permission to file a complaint in this action within twenty (20) days of any order granting this Application, as provided in Rule 3 of the Rules of Civil Procedure. The nature and purpose of the action are:

*Name and Purpose of the Action*

Free Speech Violations - North Carolina Constitutional Article 1, §§ 1 and 14; Wrongful Termination in Violation of Public Policy - North Carolina Equal Employment Practices Act, N.C. Gen. Stat. § 143-422; Wrongful Termination in Violation of the North Carolina Retaliatory Employment Discrimination Act, N.C. Gen. Stat. § 95-241(a)(1)(b) and the Occupational Safety and Health Act of North Carolina, N.C. Gen. Stat. § 95-126, *et. seq.*

| Date | Signature | |
|---|---|---|
| April 15, 2016 | | ☐ Applicant |
| | | ☒ Attorney for applicant |

| ORDER |
|---|

The Court states that the nature and purpose of this action are as set forth above.

Therefore, it is ORDERED that permission is granted to the applicant to file a complaint in this action up to and including the date shown below.

| File Complaint on or Before | Date of Order |
|---|---|
| May 5, 2016 | 4-15-16 |
| *(Date must be within 20 days of date of Order.)* | Signature |
| | ☐ Assistant Clerk of Superior Court ☐ Clerk of Superior Court |

**NOTE:** *Under Rule 3 of the Rules of Civil Procedure, upon entry of this Order, a summons shall be issued and the summons and a copy of this Order must be served in accordance with the provisions of Rule 4. A complaint must be filed in this action within the period provided above and that complaint must be served in accordance with the provisions of Rule 4 or by registered mail if the plaintiff so elects. If a complaint is not filed within the above period, the action shall abate.*

AOC-CV-101, Rev. 4/01
© 2001 Administrative Office of the Courts

# STATE OF NORTH CAROLINA

__MECKLENBURG__ County

File No.

16-CVS- 7034

Film No.

In The General Court Of Justice
☐ District   ☒ Superior Court Division

| Name Of Plaintiff | |
|---|---|
| CRYSTAL ESCHERT | **CIVIL SUMMONS**<br>**TO BE SERVED WITH**<br>**ORDER EXTENDING**<br>**TIME TO FILE COMPLAINT**<br>G.S. 1A-1, Rule 4 |
| **VERSUS** | |
| Name Of Defendant(s) | |
| CITY OF CHARLOTTE | |

| TO: | TO: |
|---|---|
| Name And Address Of Defendant 1<br>City of Charlotte<br>Attn: Ron Carlee, City Manager<br>Charlotte-Mecklenburg Government Center, 600 E. Fourth Street<br>Charlotte, NC 28202 | Name And Address Of Defendant 2 |

## A Civil Action Has Been Commenced Against You!

You are notified to appear and answer the complaint of the plaintiff as follows:

1. Serve a copy of your written answer to the complaint upon the plaintiff or the plaintiff's attorney within thirty (30) days after you have been served with the complaint as authorized in the attached order. You may serve your answer by delivering a copy to the plaintiff or the plaintiff's attorney or by mailing a copy to one of them at his/her last known address.

2. File the original of the written answer with the Clerk of Superior Court of the county named above.

If you fail to answer the complaint, the plaintiff will apply to the Court for the relief demanded in the complaint.

| Name And Address Of Plaintiff's Attorney (If None, Address Of Plaintiff) | Date 9-15-16 | Time 3:02 | ☐ AM<br>☒ PM |
|---|---|---|---|
| Margaret B. Maloney<br>Maloney Law & Associates, PLLC<br>1824 East Seventh Street<br>Charlotte        NC   28204 | Signature *Linda. B. Cloos* | | |
| | ☐ Deputy CSC    ☐ Assistant CSC | | ☐ Clerk Of Superior Court |

AOC-CV-102, Rev. 3/98
© 1998 Administrative Office of the Courts

(Over)

| RETURN OF SERVICE |
|---|

I certify that this Summons and a copy of the Order were received and served as follows:

## DEFENDANT 1

| Date Served | Name Of Defendant |
|---|---|
| | |

☐ By delivering to the defendant named above a copy of this Summons and Order.

☐ By leaving a copy of this Summons and Order at the dwelling house or usual place of abode of the defendant named above with a person of suitable age and discretion then residing therein.

☐ As the defendant is a corporation, service was effected by delivering a copy of this Summons and Order to the person named below.

*Name And Address Of Person With Whom Copies Left (if corporation, give title of person copies left with)*

☐ Service Accepted By Defendant

| Date Accepted | Signature |
|---|---|
| | |

☐ Other Manner Of Service *(specify)*

☐ Defendant WAS NOT served for the following reason:

## DEFENDANT 2

| Date Served | Name Of Defendant |
|---|---|
| | |

☐ By delivering to the defendant named above a copy of this Summons and Order.

☐ By leaving a copy of this Summons and Order at the dwelling house or usual place of abode of the defendant named above with a person of suitable age and discretion then residing therein.

☐ As the defendant is a corporation, service was effected by delivering a copy of this Summons and Order to the person named below.

*Name And Address Of Person With Whom Copies Left (if corporation, give title of person copies left with)*

☐ Service Accepted By Defendant

| Date Accepted | Signature |
|---|---|
| | |

☐ Other Manner Of Service *(specify)*

☐ Defendant WAS NOT served for the following reason:

| Service Fee Paid | Date Received | Name Of Sheriff |
|---|---|---|
| $ | | |

| Paid By | Date Of Return | County |
|---|---|---|
| | | |
| | | Deputy Sheriff Making Return |

AOC-CV-102, Side Two, Rev. 3/98
© 1998 Administrative Office of the Courts

**STATE OF NORTH CAROLINA**

Mecklenburg County

File No. 16-CVS-7034

Film No.

In The General Court Of Justice
☐ District ☑ Superior Court Division

Name Of Plaintiff

Crystal Eschert

**VERSUS**

Name Of Defendant

City of Charlotte

**DELAYED SERVICE
OF
COMPLAINT**

G.S. 1A-1, Rules 3 & 4

| TO: | TO: |
|---|---|
| Name And Address Of Defendant 1 | Name And Address Of Defendant 2 |
| City of Charlotte<br>Attn: Ron Carlee, City Manager<br>Char-Meck Government Center, 600 E. 4th St.<br>Charlotte, NC 28202 | |

You are being served with a copy of the complaint in this action, the delayed filing of which was ordered when the summons was issued. You must:

1. Serve a copy of your written answer to the complaint upon the plaintiff or the plaintiff's attorney within thirty (30) days after you have been served. You may serve your answer by delivering a copy to the plaintiff or the plaintiff's attorney or by mailing a copy to one of them at his/her last known address.

2. File the original of the written answer with the Clerk of Superior Court of the county named above.

If you fail to answer the complaint, the plaintiff will apply to the Court for the relief demanded in the complaint.

Name And Address Of Plaintiff's Attorney (If None, Address Of Plaintiff)

Date 5/05/16

Time 4:51 ☐ AM ☑ PM

Signature

☐ Deputy CSC ☐ Assistant CSC ☐ Clerk Of Superior Court

I certify that this Document and a copy of the Complaint were received and served as follows:

## DEFENDANT 1

| Date Served | Time Served | ☐ AM ☐ PM | Name Of Defendant |
|---|---|---|---|
| | | | |

☐ By delivering to the defendant named above a copy of this Document and Complaint.

☐ By leaving a copy of this Document and Complaint at the dwelling house or usual place of abode of the defendant named above with a person of suitable age and discretion then residing therein.

☐ As the defendant is a corporation, service was effected by delivering a copy of this Document and Complaint to the person named below.

Name And Address Of Person With Whom Copies Left (if corporation, give title of person copies left with)

☐ Service Accepted By Defendant

| Date Accepted | Time Served | ☐ AM ☐ PM | Signature |
|---|---|---|---|
| | | | |

☐ Other Manner Of Service (specify)

☐ Defendant WAS NOT served for the following reason:

## DEFENDANT 2

| Date Served | Time Served | ☐ AM ☐ PM | Name Of Defendant |
|---|---|---|---|
| | | | |

☐ By delivering to the defendant named above a copy of this Document and Complaint.

☐ By leaving a copy of this Document and Complaint at the dwelling house or usual place of abode of the defendant named above with a person of suitable age and discretion then residing therein.

☐ As the defendant is a corporation, service was effected by delivering a copy of this Document and Complaint to the person named below.

Name And Address Of Person With Whom Copies Left (if corporation, give title of person copies left with)

☐ Service Accepted By Defendant

| Date Accepted | Time Served | ☐ AM ☐ PM | Signature |
|---|---|---|---|
| | | | |

☐ Other Manner Of Service (specify)

☐ Defendant WAS NOT served for the following reason:

| Service Fee Paid $ | Date Received | Name Of Sheriff |
|---|---|---|
| Paid By | Date Of Return | County |
| | | Deputy Sheriff Making Return |

AOC-CV-103, Side Two, Rev. 1/10
© 2010 Administrative Office of the Courts

STATE OF NORTH CAROLINA

COUNTY OF MECKLENBURG

CRYSTAL ESCHERT,

Plaintiff,

v.

CITY OF CHARLOTTE,

Defendant.

**AFFIDAVIT OF SERVICE**

The undersigned, being first duly sworn, deposes and says:

1.     A copy of the Verified Complaint in this action was deposited on May 5, 2016, with Federal Express overnight delivery service, direct signature required, to Defendant City of Charlotte at its business address to the attention of Ron Carlee, City Manager, City of Charlotte, 600 E. Fourth Street, Char-Meck Government Center, Charlotte, NC 28202. Such copies were in fact delivered to the City of Charlotte at the above-listed address on May 6, 2016, as evidenced by the attached proof-of-delivery printout showing the signature of A. Maynard, such genuine page being marked **Exhibit A**, attached hereto, and made a part of this Affidavit.

2.     Therefore, the City of Charlotte has been duly served in accordance with Rule 4 of the North Carolina Rules of Civil Procedure.

1

This, the 10th day of May, 2016.

MALONEY LAW & ASSOCIATES, PLLC

_____

Margaret Behringer Maloney, N.C. Bar No. 13253
1824 East 7th Street
Charlotte, NC 28204
mmaloney@maloneylegal.com
Telephone: 704-632-1622
Facsimile: 704-632-1623
*Attorney for Plaintiff*


Sworn to and subscribed before me,
This, the 10th day of May, 2016.

_____
Notary Public

My commission expires: May 6, 2019

2



May 6,2016

Dear Customer:

The following is the proof-of-delivery for tracking number **776277516507**.

## Delivery Information:

| | | | |
|---|---|---|---|
| Status: | Delivered | Delivered to: | Receptionist/Front Desk |
| Signed for by: | A.MAYNARD | Delivery location: | 600 E FOURTH 15 |
| | | | CHARLOTTE, NC 28202 |
| Service type: | FedEx Priority Overnight | Delivery date: | May 6, 2016 10:20 |
| Special Handling: | Deliver Weekday | | |
| | Direct Signature Required | | |

## Shipping Information:

| | | | |
|---|---|---|---|
| Tracking number: | 776277516507 | Ship date: | May 5, 2016 |
| | | Weight: | 0.5 lbs/0.2 kg |

**Recipient:**
Ron Carlee, City Manager
City of Charlotte
600 E. Fourth Street
Char-Meck Government Center
CHARLOTTE, NC 28202 US
**Reference**

**Shipper:**
Melissa Hall
Maloney Law & Associates, PLLC
1824 East Seventh Street
Charlotte, NC 28204 US

Eschert

Thank you for choosing FedEx.

*Exhibit A*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing **AFFIDAVIT OF SERVICE** was served upon the following by depositing a copy thereof in the U.S. mail, postage prepaid and addressed as follows:

> Ron Carlee, City Manager
> City of Charlotte
> 600 E. Fourth Street
> Char-Meck Government Center
> Charlotte, NC 28202

This, the 10th day of May, 2016.

Margaret B. Maloney

MALONEY LAW & ASSOCIATES, PLLC
1824 East Seventh Street
Charlotte, NC 28204
Telephone: (704) 632-1622
Facsimile: (704) 632-1623

3

STATE OF NORTH CAROLINA

COUNTY OF MECKLENBURG

CRYSTAL ESCHERT,

                    Plaintiff,

v.

CITY OF CHARLOTTE,

                    Defendant.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
16-CVS-7034

**VERIFIED COMPLAINT**

COMES NOW Plaintiff Crystal Eschert, complaining of Defendant City of Charlotte and

alleges as follows:

## PARTIES

1.      Plaintiff Crystal Eschert ("Plaintiff" or "Eschert") is an adult citizen and resident

of Indian Trail, Union County, North Carolina.

2.      Upon information and belief, Defendant City of Charlotte (the "City" or

"Defendant") is a municipal corporation duly organized and existing under the laws of the State

of North Carolina, with its principal office and place of business in Charlotte, Mecklenburg

County, North Carolina.

3.      Defendant maintains and administers a fire department known as the City of

Charlotte Fire Department (the "Fire Department").

4.      To the extent it is applicable, Defendant has adopted a plan of insurance pursuant

to N.C. Gen. Stat. § 160-A-485 and has waived its immunity from civil liability.

## JURISDICTION AND VENUE

5.      The unlawful practices alleged in this complaint were committed in Mecklenburg

County, North Carolina.

1

6.     Jurisdiction and venue are proper in this court pursuant to N.C. Gen. Stat. §§ 1-75.4 and 1-79 and 29 U.S.C. § 2617(a)(2).

## ADMINISTRATIVE PROCEDURES

7.     Eschert timely submitted a charge of discrimination ("Charge") against Defendant with the Equal Employment Opportunity Commission ("EEOC") on or about March 24, 2015.

8.     On or about April 19, 2016, Eschert received a Notice of Right to Sue from the EEOC entitling her to commence a Title VII action within 90 days of receipt of that notice.

9.     Eschert timely filed a complaint of discrimination and retaliation against her by Defendant with the North Carolina Department of Labor ("NCDOL") Employment Discrimination Bureau on or about March 24, 2015.

10.     On or about January 21, 2016, Eschert received a Notice of Right to Sue from the NCDOL entitling her to commence a Retaliatory Employment Discrimination Act (N.C. Gen. Stat. 95-240 *et seq.*, or "REDA") action within 90 days of receipt of that notice.

11.     Eschert has satisfied all private, administrative, and judicial prerequisites to the institution of this action.

## INTRODUCTION AND NATURE OF ACTION

12.     Eschert, a former employee of the Fire Department and City, brings this action against Defendant for gender discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e *et seq.*; wrongful discharge in violation of public policies, and REDA, and for violations of the First Amendment to the U.S. Constitution. Eschert brings this action after significant investigation (including multiple witness interviews) by the NCDOL, which found cause and substantiated Eschert's claims of retaliation; and an investigation by third-party investigator Allison Van Laningham ("Van Laningham") of Turning

2

Point Litigation. The Van Laningham Report found that there was a deep-seated distrust of Fire Chief Jon Hannan ("Chief Hannan") and Deputy Chief Rich Granger ("Deputy Chief Granger") and a pervasive fear that they would retaliate against anyone who opposed them or did something they did not like and would lie to accomplish their goals.

## BACKGROUND

13.     Eschert is a 29-year-old wife and mother who worked for the City as a fire investigator until she was wrongfully terminated after complaining about health and safety issues and questionable financial management practices by the Fire Department, which treats female employees disparately from male employees related to discipline and termination.

14.     Eschert grew up around firefighters at the fire station where her father served her hometown community. Multiple family members serve as dedicated firefighters. She is proud of their work and accomplishments.

15.     Growing up, Eschert dreamed of a fire service career. She became a trained volunteer firefighter cadet in 2000 and a full-time volunteer in 2005. She worked in that capacity when in her hometown, including a paid summer internship as a firefighter in 2009, until 2010 when she moved to Charlotte to accept a position as fire investigator with the Charlotte Fire Investigation Task Force.

16.     Eschert obtained her college degree in 2009 from Eastern Kentucky University ("EKU") in Fire and Safety Engineering Technology, and focused on a career as a fire investigator.

17.     Eschert became employed by the City effective April 5, 2010, as a Fire Investigator.

18.     When Eschert joined the Fire Department, she had:

3

a) Accumulated ten years of experience with the Shelbyville Fire Protection District in Shelbyville, Illinois, with five years as a Volunteer Firefighter Cadet and five years as a Volunteer Firefighter;

b) Served as a Firefighter Intern with the Pleasant View Fire Department in Pleasant View, Tennessee;

c) Earned designation as a Certified Fire and Explosion Investigator from the National Association of Firefighter Investigators;

d) Served as a Graduate Assistant in the Fire and Safety Program at EKU; and

e) Been elected to represent EKU at conferences such as Fire Department Instructors Conference ("FDIC") and the International Association of Fire Chiefs Conference ("ICHIEFS").

19.     Fire Department management knew when they hired her that Eschert was devoted to a long-term career working in a fire department.

20.     Eschert planned her life around her career goal and made a significant personal and financial investment in her education and training as a Fire Investigator. She moved out of state and farther away from her family to pursue her dream job.

21.     Throughout her tenure with the Fire Department, Eschert demonstrated her long-term commitment to a career as a Fire Investigator by continuing to invest in her education directly related to her work as a career fire employee, with the knowledge and approval of Fire Department management.

22.     For example, while with the Fire Department Eschert completed more than 270 hours of training in more than thirty courses, including:

a) Vacant and Abandoned Buildings: Hazards and Solutions;

b) Incident Response to Terrorist Bombings;

c) Fire/Arson Origin and Cause Investigation; and

d) Electrical Fire Investigation.

4

23.    In addition, after Eschert joined the Fire Department, she earned certifications to be a North Carolina Certified Fire Investigator in April 2012 (which she maintains to date) and an Incident Response to Terrorist Bombings Instructor in January 2014.

24.    Eschert continued her advanced studies even after joining the Fire Department, earning a Master's Degree in Safety, Security, and Emergency Management with a Certificate in Homeland Security from EKU.

25.    Eschert also taught a class for the University of North Carolina at Charlotte ("UNCC") Fire Safety Engineering Program in the spring of 2014 and previously assisted with the Fire Lab in the fall of 2010.

26.    At the time of her termination from the Fire Department, Eschert was completing her application for the International Association of Fire Investigators ("IAFI") certification exam.

**Fire Investigator with the Fire Department**

27.    As a fire investigator, Eschert's responsibilities included responding to and investigating fire incidents to determine whether a fire was accidental in nature or arson. She also responded to post-blast scenes, visited burn victims at the hospital to document injuries for statistical purposes, and scenes in which fire-related death occurred.

28.    As a fire investigator Eschert observed, documented, and collected physical evidence and interviewed witnesses and suspects to help determine a fire's origin and cause.

29.    Eschert also spent time in the community by attending Fire Safety Presentations at Charlotte-Mecklenburg schools and was a Big Sister in the Big Brothers/Big Sisters Club at Sedgefield Elementary School.

5

30.     In rare cases, fire investigators can be called upon to testify in court about their findings. During Eschert's tenure with the Fire Department, she was aware of only one Fire Investigator who was called upon to testify.

31.     Eschert was known for working hard, going the extra mile, not giving up, possessing strong analytical skills, working well with others, and searching for ways to make improvements.

32.     Eschert's last two performance reviews compliment her performance in the areas of customer service, communication, teamwork, positive attitude, credibility, accountability, valuing diversity, and taking initiative and problem solving, as follows:

a) Customer Service: "Eschert communicates clearly and effectively with internal and external customers;"

b) Teamwork: "Eschert is consistent in her actions towards teamwork" and she "approaches work with a positive and flexible attitude;"

c) Openness: "Eschert has established herself as a credible source within the fire investigation community," "has established good rapport with personnel from" the fire, police, and other City departments, and "frequently shares information and searches for ways to make improvement;"

d) Accountability: "Eschert accepts responsibility for her actions and consistently makes decisions in the best interest of the Fire Investigation Task Force and the Charlotte Fire Department." Eschert also "assisted with educating interns ... on aspects of the fire service and investigative careers;"

e) Diversity: "Eschert has consistently shown courtesy and respect for others," "recognizes and acknowledges the diversity of customers and members" of her department, and "seeks to understand different points of view, both internally and externally;" and

f) Initiative and Problem Solving: "Eschert collaborates ... to make decisions and solve problems," "often encourages open dialog [sic]," and "readily identifies problems and willingly brings issues to the forefront for discussion and correction."

6

33.     Management formally recognized Eschert as an asset to the Fire Department, rating her as meets or exceeds annually throughout her tenure, and providing her with a merit increase each year.

34.     Eschert's performance review for the 2013 fiscal year, which ended June 30, 2014, was delivered to her on August 19, 2014, with a rating of "A," indicating that her "Performance Achieved Expectations" for "a job well done."

35.     Eschert's hard work and dedication paid off and resulted in accolades beyond the City. For example, she was named 2012 Fire Investigator of the Year as part of the Fire Investigation Task Force by the North Carolina and South Carolina Chapters of the International Association of Arson Investigators.

36.     Even Chief Hannan acknowledged to Ray Eschert, Eschert's father-in-law, in or around January 2014, that he knew who Eschert was and had heard that she did great work.

**Fire Department and Chief Hannan**

37.     The Fire Department is a division of the City.

38.     The Fire Chief is also the Director of Homeland Security for the City. As the Homeland Security Director, the Fire Chief coordinates with state and federal officials to support and fund initiatives important to the safety and security of the City and its inhabitants.

39.     The Fire Chief is responsible for all Fire Department functions, including operations and financial management.

40.     The Fire Chief is managed by and responsible to the City Manager, with support from the Office of the City Attorney ("Legal Department") and Human Resources Department.

41.     Chief Hannan has been the Fire Chief since November 15, 2007. Chief Hannan sets the tone and direction of leadership of the Fire Department.

42. Upon information and belief, City management has a history of deferring to Chief Hannan and not requiring him to follow city policies and procedures, including on the following types of matters:

a) Personnel;

b) Financial management, including large expenditures;

c) Training;

d) Promotions;

e) Discipline;

f) Terminations;

g) Facilities management; and

h) Construction and renovation.

43. Upon information and belief, City management and its Legal Department have taken the position that Chief Hannan does not have to be right in his employment decisions in order for the City to support and defend him against complaints by employees and former employees.

44. Upon information and belief, City management has taken the position that Chief Hannan does not have to be right in his financial decisions in order for the City to support and defend him in these decisions.

45. Under Chief Hannan and his leadership, the Fire Department has:

a) Upon information and belief, tried to avoid reporting expenditures that required approval of the Charlotte City Council;

b) Upon information and belief, used personal email accounts rather than City accounts for City business in an attempt to avoid the public access laws. (N.C. Gen. Stat. § 132 *et seq.*);

8

c) Upon information and belief, used personal computers rather than City computers for City business in an attempt to avoid the public access laws. (N.C. Gen. Stat. § 132 *et seq.*); and

d) Mischaracterized renovations and remodeling of Fire Department facilities as "maintenance" rather than "renovations" in order to avoid obtaining the proper permits needed to perform the work.

46. Chief Hannan has been criticized internally and externally for his financial mismanagement and poor financial decisions, yet the City continues to protect him.

47. Indeed, under Chief Hannan, the Fire Department engaged in financial mismanagement including:

a) Approval of reimbursement of inappropriate personal expenses for favored senior employees;

b) Approval of reimbursement of excessive expenses for favored senior employees;

c) Approval of rehiring retirees or paying them as independent contractors;

d) Approval of paying significant, unnecessary overtime to one individual for work performed rather than delegating the work to multiple individuals; and

e) Approval of extravagant spending on the Fire Department Headquarters building at 500 Dalton Avenue.

**Arson Task Force Building, 1222 Statesville Avenue and 1517 North Graham Street**

48. A serious example of financial mismanagement involved selection and renovation of a new site for the Arson Task Force, the department that includes the Fire Investigators.

49. In or around the spring of 2012, the members of the Fire Department's Arson Task Force were told that they would be moving into a new building to be located at 1222 Statesville Avenue and that a budget of $1.87 million had been allocated for renovation of the facility and new furnishings.

9

50.     The City paid an architect approximately $151,874 to develop plans for the renovation. A new roof was installed for approximately $78,900; additional work in the amount of $13,450 was also performed.

51.     Contractors started construction on the new Fire Department Headquarters building on an adjacent property located at 500 Dalton Avenue in March 2012.

52.     The original budget for the new Fire Department Headquarters was $9.5 million.

53.     In the summer of 2013, there were internally-sent emails about a budget shortfall of $900,000 for the Fire Department Headquarters building.

54.     By April 10, 2015, the total project cost for the Fire Department Headquarters building had nearly doubled, having grown to $16 million.

55.     Concerns have been expressed by the public and the media about the finances and expenditures for the new Fire Department Headquarters building.

56.     In or around January 2014, the Fire Department decided to tear down the 1222 Statesville Avenue building to use the space as a parking lot for the new Headquarters Building and the relocated Joint Communications Center.

57.     In or around the first quarter or April of 2014, Eschert learned that Fire Department management had decided to change the location of the new Arson Task Force from the building located at 1222 Statesville Avenue to the building located at 1517 North Graham Street.

58.     The City eventually paid to have the 1222 Statesville Avenue building demolished on top of its previous investment of $244,224 to improve the same building.

59.     Eschert was concerned because significant monies from the renovation budget had already been spent on the 1222 Statesville Avenue location and it was unclear how much

10

money would be available and necessary to renovate the new location. She knew that the 1517 North Graham Street building was an older building in very poor condition and would require significant renovations and funding. Upon information and belief, it was a former dye manufacturing facility, and it had been used for storage rather than offices for many years.

60.     When the construction had been delayed for over a year, the Fire Department blamed weather and subcontractors. For example, a glass subcontractor rebutted that claim by saying that the City and its architect had insisted unnecessarily on steel windows instead of aluminum, causing the delay and costing tax payers an additional $1 million.

61.     Eschert expressed concerns to Arson Task Force management about the health and safety of the 1517 North Graham Street building, the waste of funds on the 1222 Statesville Avenue building, and concerns about properly funding adequate renovations for the building. They did not disagree with her concerns but seemed unable to address them.

62.     Eschert decided to contact her father-in-law, Ray Eschert, who is knowledgeable about construction and Occupational Safety and Health Administration ("OSHA") regulations related to her building safety concerns, the renovations needed to make the building a safe and healthy workplace, and whether there was enough money left in the budget for the necessary renovations.

63.     Ray Eschert was well known to Chief Hannan and Deputy Chief Granger as a community leader with vast political connections and close ties to various members of local government, including members of the City Council. Both Chief Hannan and Deputy Chief Granger have attended Ballantyne Breakfast Club meetings, which are organized and hosted by Ray Eschert and attended by local politicians and community leaders, including members of City Council.

11

64.     On April 7, 2014, Eschert and her father-in-law toured the second Arson Task Force Building at 1517 North Graham Street with Senior Fire Investigator David Williams ("Senior Fire Investigator Williams") and Chief Fire Investigator Paul Wilkinson ("Chief Fire Investigator Wilkinson").

65.     Senior Fire Investigator Williams and Chief Fire Investigator Wilkinson arrived in the same vehicle. They had the key to the building; Eschert did not. Moreover, Ray Eschert did not want to enter the building without management approval, which was provided.

66.     During the tour they all noted that the building was in very poor condition. Indeed, they observed: standing blue water in the basement; a leak that caused part of the ceiling to collapse on the second floor; exposed wiring dangling from the ceiling and running along the walls; a rickety wooden elevator; and a sump pump in the basement for the blue-tinted water. Ray Eschert expressed particular concern that potentially hazardous waste was been being pumped out of the building and could be an Environmental Protection Agency ("EPA") issue.

67.     On April 9, 2014, Chief Fire Investigator Wilkinson emailed the Fire Investigators that the total budget for renovating the 1517 North Graham Street building was reduced to $700,000, because part of the original budget had been diverted to the new Logistics building. The email further advised that they would be moving into the 1517 North Graham Street building in the fall of 2014.

68.     On April 10, 2014, Eschert forwarded Chief Fire Investigator Wilkinson's April 9, 2014 email to Ray Eschert from her City email account.

69.     On April 11, 2014, Ray Eschert forwarded Chief Fire Investigator Wilkinson's April 9, 2014 email to City Council Member Claire Fallon ("Council Member Fallon"), suggesting that they walk through the building together.

70.     Upon information and belief, On April 12, 2014, Ray Eschert spoke with Randy Harrington, who was then the Assistant Director of Budget and Finance ("Assistant Budget Director Harrington"), about his concerns related to the poor condition of the 1517 North Graham Street building, the budgeted funds for the new Arson Task Force location that had already been spent on the 1222 Statesville Avenue building renovation, and whether there were enough funds remaining in the budget to complete the renovations needed to make the 1517 North Graham Street building safe for occupancy.

71.     On April 13, 2014, Ray Eschert emailed Assistant Budget Director Harrington that he was going to back off of the building issues at the 1517 North Graham Street location because "it could become an issue for my daughter-in-law and her supervisors."

72.     On April 14, 2014, Assistant Budget Director Harrington responded to Ray Eschert that "I think that's probably a wise choice to back off the building item."

73.     Assistant Budget Director Harrington's email advised further that he had already followed up on Ray Eschert's funding concerns and had been advised that there was in fact enough left in the budget for the renovations.

74.     As alleged above, in the summer of 2014 the move-in date for the 1517 North Graham Street building was moved up from the fall to August 2014.

75.     Eschert was concerned, because in light of the accelerated move-in date, not much progress had been made on the renovations to the building.

76.     During this time, the Fire Department began excluding Eschert's supervisor, Senior Fire Investigator Williams, as well as Deputy Chief Rob Kinniburgh ("Deputy Chief Kinniburgh") from meetings related to the renovation of the 1517 North Graham Street building. Upon information and belief, at their last meeting Senior Fire Investigator Williams made

suggestions about things needed for the building, and Deputy Chief Kinniburgh questioned the budget and the funds being diverted to the Logistics building. Upon information and belief, the next day Deputy Chief Granger advised Senior Fire Investigator Williams and Deputy Chief Kinniburgh that they were no longer part of the committee for the renovations of the 1517 North Graham Street building.

77. Also in the summer of 2014, the Arson Task Force was instructed to use the word "maintenance" rather than "renovation" to describe the work being done at 1517 North Graham Street building, because Fire Department management was trying to avoid having to get permits.

78. Upon information and belief, the Fire Department was also referring to the renovation work as "maintenance" rather than "renovation" to allow payment from a general maintenance account rather than from a budget which had once been allocated for the renovations of the 1222 Statesville Avenue building but that was then being split between the 1517 North Graham Street building, the Logistics building at 1501 North Graham Street, and the new Fire Department Headquarters.

79. In or around the end of July to the beginning of August 2014, Eschert and the Fire Investigators were informed that they would be moving into the 1517 North Graham Street building by the end of August. As of the date of the announcement, Eschert did not consider the building fit for occupancy. She expressed her concern to her father-in-law that there was a pending move-in date although the building was not ready. She also advised him that she was preparing a memorandum or letter outlining her concerns about the building.

80. On August 2, 2014, Eschert notified Ray Eschert that she had received a key to the 1517 North Graham Street building. He indicated he would discuss touring the building with

14

Council Member Fallon, who was the Chair of the Community Safety Committee of the Charlotte City Council at that time.

81. On or about August 12, 2014, Eschert learned that the Fire Educators had already begun moving their physical work spaces into the 1517 North Graham Street building, a process that was completed by August 13, 2014.

82. Eschert was increasingly concerned about the move-in date for the Fire Investigators due to the state of the building and the health and safety concerns it posed, particularly since investigators sometimes sleep in the building while they are on duty and there were questions about air quality and the blue-tinted water in the building.

83. On August 12 and 14, 2014, Ray Eschert spoke again with Council Member Fallon regarding the 1517 North Graham Street building and the growing concern that the property was not fit for occupancy even though some employees had already moved in.

84. Eschert to give Eschert her contact information so that Eschert could forward her concerns directly to Council Member Fallon.

85. On August 14, 2014 at 8:22 a.m., Eschert emailed Council Member Fallon about the property located at 1517 North Graham Street.

86. Prior to sending the email, Eschert got permission from her manager, Senior Fire Investigator Williams, to tell Council Member Fallon that Fallon could contact him directly if she had any questions. Accordingly, Eschert provided Council Member Fallon with Senior Fire Investigator Williams' mobile telephone number.

87. Upon information and belief, Council Member Fallon advised City management that she had received a complaint about the condition of the 1517 North Graham Street building and questioned whether it was safe for employees.

15

88.     Upon information and belief, there were discussions among combinations of City Attorney Robert Hagemann ("City Attorney Hagemann"), then-Mayor Dan Clodfelter ("Mayor Clodfelter") and City Manager Ron Carlee ("City Manager Carlee") to discuss the matter.

89.     Upon information and belief, Mayor Clodfelter contacted City Manager Carlee and arranged for Council Member Fallon to tour the building with various officials and representatives of the City and the Fire Department.

90.     Upon information and belief, on or about August 14, 2014, Fire Department management, including Deputy Chief Granger and Chief Hannan, learned that Council Member Fallon had concerns about the 1517 North Graham Street building and would be inspecting it. The inspection was scheduled for August 20, 2014. Both Deputy Chief Granger and Chief Hannan planned to attend the tour.

91.     Upon information and belief, when Chief Hannan and Deputy Chief Granger found out that Council Member Fallon was scheduled to tour the second Arson Task Force building, they determined that Eschert was the Fire Investigator responsible for getting Council Member Fallon involved.  Chief Hannan and, upon information and belief, Deputy Chief Granger knew Ray Eschert was Eschert's father-in-law, and also knew of the close connections between Ray Eschert and Council Member Fallon.

92.     Upon information and belief, Eschert was the only Fire Investigator as of August 2014 with ties to Council Member Fallon.

93.     In addition, it was well known within the Arson Task Force that although others had complained about the building, Eschert was the most vocal. The Van Laningham Report described Eschert as "a de facto spokesperson, in part due to her connection with her father-in-law, Ray Eschert."

16

94.     Indeed, Eschert had expressed her concerns about mold in the prior Arson Task Force building at 1215 South Boulevard to her supervisor, Senior Fire Investigator Williams, which resulted in testing.

95.     On or by August 14, 2014, the City Manager's office and City management learned of the complaint sent to Council Member Fallon, which detailed a variety of issues about the Fire Department and the 1517 North Graham Street building and led to the tour scheduled for August 20, 2014.

96.     Eschert's August 14, 2014 email to Council Member Fallon detailed complaints about the financial mismanagement by Fire Department management in addition to the health and safety risks posed by the 1517 North Graham Street building. Specifically, Eschert complained that:

> a)  Fire Department management knew that the structure would not pass a building inspection;
>
> b)  Fire Department management had instructed employees to refer to the work as "maintenance" and not "renovations" in order to avoid scrutiny of work that was being done without the required permits;
>
> c)  The building posed health and safety risks because of remaining asbestos, roof leaks, blue dye seepage, a singular second floor egress, open fencing (which was a security issue), leaking and non-closing windows, and a rickety wooden elevator;
>
> d)  Fire Department management knew that many employees suffered from asthma, required Continuous Positive Airway Pressure ("CPAP") machine therapy at night, or had other conditions that would be exacerbated by the deplorable condition of the 1517 North Graham Street building;
>
> e)  Fire Department management knew that Fire Investigators would sleep in the building, which they knew required a Change of Occupancy permit;

17

f) The building was inadequate for use by the Arson Task Force because it lacked garage parking for work trucks, and basement flooding made the space unusable for evidence and equipment storage; and

g) Senior Fire Investigator Williams told fire investigators that the elevator was supposed to be removed and replaced, which was not done before employees moved into the building. Upon information and belief, the cost of removing and replacing the elevator was significantly more than expected and prohibitively expensive. Thus, the elevator is currently locked and out of service. This renders the building non-compliant with the Americans with Disabilities Act ("ADA") even though it is open to the public as a "Safe Place."

97. In her email to Council Member Fallon, Eschert advised that her supervisor, Senior Investigator Williams, was "on board," and as alleged above, gave Council Member Fallon his mobile telephone number in case Council Member Fallon had questions for him.

98. At the direction of Chief Hannan, Deputy Chief Granger prepared a memorandum summarizing the Fire Department's expenditures and planned use of the second Arson Task Force building located at 1517 North Graham Street, as well as the planned Fire Logistics building to be located at 1501 North Graham Street.

99. Deputy Chief Granger completed his memorandum on or about August 14, 2014 and provided a copy to Chief Hannan. On August 15, 2014, City Manager Carlee also received a copy of the memorandum.

100. On August 15, 2014, City Manager Carlee informed the Assistant City Manager that City Manager Carlee planned to tour both of the buildings located at 1517 North Graham Street and 1501 North Graham Street, along with Council Member Fallon.

101. On August 15, 2014, City Manager Carlee also asked the Assistant City Manager to obtain from Fire Department management itemized budgets for the buildings located at 1517 North Graham Street and 1501 North Graham Street, along with a comparison of each budget to new construction of facilities for the Arson Task Force and Fire Logistics.

18

102.    In the meantime, the City Manager's office gathered information from the Fire Department about the budget for the 1517 North Graham Street building.

103.    In addition, after Council Member Fallon' tour and inspection was scheduled, there was a flurry of activity at the 1517 North Graham Street location, which included a new gate at the entrance off of Tryon Street; work to the Secretary and Educators' offices and bathrooms; and removal of shelving and a small amount of the asbestos downstairs.

104.    In and around September 2014, one of Eschert's coworkers, to whom she did not have close ties, warned her that she would have a "target on her back" due to her escalation of her complaints. Other coworkers gave her similar warnings.

105.    On August 19, 2014, Eschert inspected the status of the renovations of the second Arson Task Force location at 1517 North Graham Street and took photographs. While she was there, she ran into Deputy Chief Granger, Fire Department Human Resources Manager Kristi Kjeldsen ("HR Manager Kjeldsen"), and City Building Services Superintendent Sue Rutledge ("Superintendent Rutledge"), who were touring the building and talking to contractors while referring to paper lists and documents.

106.    Eschert observed that Deputy Chief Granger was extremely nervous and sweating throughout the tour, despite air conditioning in the building.

107.    Later that same day, Chief Fire Investigator Wilkinson notified Fire Investigators and Fire Educators that no one was to be in or at the building located at 1517 North Graham Street on August 20, 2014, the day Council Member Fallon was scheduled to tour the building, between the hours of 9:30 a.m. and 2:30 p.m.

108.    That same day, August 19, 2014, Council Member Fallon confirmed to Eschert that Fallon would be visiting the building located at 1517 North Graham Street the following day

19

and asked Eschert to send her any additional concerns. In response, Eschert prepared an email to Council Member Fallon which further detailed her complaints about the building located at 1517 North Graham Street.

109. Prior to sending the email, Eschert printed it out for review and input from her supervisor, Senior Fire Investigator Williams, and from Fire Investigator Andrew Bennett ("Fire Investigator Bennett"). She also forwarded a copy via her City email to Fire Investigator Thomas Aaron Goforth ("Fire Investigator Goforth") at his City email address for his review and comment. Once she heard back from Senior Fire Investigator Williams and Fire Investigator Bennett, she forwarded the email to Council Member Fallon on August 19, 2014, at approximately 5:57 p.m. No one else wanted to sign the email, so Eschert sent it from herself alone. She told Fire Investigator Goforth she had sent the email to Council Member Fallon.

110. As alleged above, the variety of complaints detailed in Eschert's August 19, 2014 email about the second Arson Task Force building at 1517 North Graham Street included:

a) Site security issues such as holes in the fence in a heavy foot traffic area;

b) No garage parking, so that work trucks could only be parked outside, unattended and exposed to risks of break-ins and vandalism that would impair quick and effective response to fire, explosions, and burns and would also force equipment cleaning and inspection to take place outside, even during inclement weather;

c) Conditions that would not pass building or electrical inspection;

d) Electricity to diesel trucks in the parking lot which would be sourced by extension cords issuing from the interior of the building to the parking lot;

e) Non-compliance with accessibility requirements under the Americans with Disabilities Act;

f) Non-compliance with building codes with only one egress from the second floor that would house sleeping quarters;

20

g) Air quality concerns where asbestos had been removed from the building and walls were being moved without permits and without proper abatement;

h) Inadequate and unsafe kitchen facilities, including visible burn patterns issuing from the microwave;

i) Inadequate access to a basement which could only be accessed by use of a wooden elevator;

j) The flooded basement due to a leaking pipe and improper exterior drainage, a problem that was inadequately mitigated by three sump pumps, and which made the basement completely unusable for storage because the water would damage equipment and evidence;

k) Blue dye seepage from the wall cracks and floor of the basement;

l) Windows which could not be closed completely;

m) The condition of the roof and second story ceiling, which had partially collapsed, had been patched instead of replaced because replacement would require expensive asbestos abatement;

n) Visible water line running down the interior walls from the ceiling down;

o) Visibly dirty heating, ventilating, and air conditioning duct work;

p) Wall placement which had created wasted space that would not be corrected because of the expense of obtaining permits;

q) Mold which was visible in the women's shower on the second floor; and

r) Work which was being done without permits, despite advice from subcontractors to Fire Department management that the work would not bring the building to a condition that would pass inspection.

111. On August 20, 2014, at approximately 1:00 p.m., Council Member Fallon toured the building located at 1517 North Graham Street, along with: City Manager Carlee; Chief Hannan; Deputy Chief Granger; Superintendent Rutledge; Engineering, Property Management and Building Maintenance Division Operations Supervisor Steve Marlowe ("Operations

21

Supervisor Marlowe"); and then Assistant City Manager Eric Campbell ("Assistant City Manager Campbell").

112.    During the tour, Council Member Fallon asked about the requirement for permits for the work being performed. Upon information and belief, Superintendent Rutledge told Council Member Fallon that permits for the work were not required.

113.    Indeed, this statement had to be retracted later after media inquiries about the work being performed without proper permitting. Upon information and belief, Superintendent Rutledge was aware of the type of work being performed at the 1517 North Graham Street facility and knew or should have known that a permit was required by the County. It was her job to know this.    Upon information and belief, Rutledge's son-in-law works for the Fire Department.

114.    Additionally, Fire Department management should have also known that a permit was required for the work being performed at the 1517 North Graham Street facility because when the Fire Department conducts inspections, they know to check permits. The work being done obviously included major renovations, not simple maintenance and cosmetic work.

115.    Upon information and belief, Council Member Fallon asked questions about permits, inspections, finances, the budget, health and safety issues, whether any employees were currently working there, and a variety of other questions about the state of the building and the needed renovations.

116.    Upon information and belief, at the conclusion of the August 20, 2014 tour, Council Member Fallon also observed that Deputy Chief Granger was extremely nervous and had been sweating throughout the tour, despite air conditioning in the building. Eschert had observed that Deputy Chief Granger was nervous and fidgety when at the building the prior day.

22

117. Upon information and belief, at the conclusion of the August 20, 2014 tour Council Member Fallon stated her belief that, despite the work being done, the building located at 1517 North Graham Street was uninhabitable. Upon information and belief, she said that she would not "put a pig in that building."

118. In the Van Laningham Report, the statement that Council Member Fallon was satisfied and happy following the tour was attributed to Chief Hannan and Deputy Chief Granger. City Manager Carlee reported that he believed Council Member Fallon was satisfied with the work being done. Further, Superintendent Rutledge reported that Council Member Fallon said she did not think there was a mold problem.

119. Upon information and belief, those statements are inconsistent with Council Member Fallon's opinion and what was expressed to those present during the tour. Upon information and belief, Council Member Fallon told Van Laningham and the NCDOL after the tour that she thought the building was uninhabitable.

**Facebook and "Linda Havery"**

120. In 2014, Eschert maintained a personal Facebook account, which was set on a private setting so that only her Facebook friends have access to her Facebook timeline, posts, and shares.

121. On August 20, 2014, at approximately 7:16 a.m., Eschert posted a comment on her Facebook account (the "First Facebook Post"), which could only be accessed directly by her Facebook friends.

122. The comment Eschert posted on her private Facebook page stated that on the previous day a "White guy [was] shot by police" and that Eschert was "So tired of hearing it's a

23

racial thing. If you are a thug and worthless to society, it's not race – You're just a waste no matter what religion, race, or sex you are."

123.    The comment Eschert posted that day was a private expression of her personal opinion expressed as part of a public debate occurring throughout the country at the time. Her comments did not target a particular race or group, and her intent was not racially motivated – as indicated by the statement "it's not about race."

124.    Upon information and belief, the City acknowledged in its response to the NCDOL that the post does not target any specific individual or group.

125.    Eschert's post referenced a news report that a white citizen had been shot by a black or African-American police officer. At the time she posted it, she was relying on an erroneous news report that the shooting had taken place near Ferguson, Missouri which she later learned was incorrect. The shooting had actually taken place in Utah on August 11, 2014. She took down the post promptly after being made aware of inaccuracies about the news report at issue which she had repeated in her post.

126.    Eschert grew up approximately two hours from Ferguson, Missouri, which was a frequent topic of media discussion during this time and visited the St. Louis area many times.

127.    Issues related to police officers are of particular interest to Eschert because she is married to Jason Eschert, who was then a police officer for the City of Concord, North Carolina.

128.    At that time, Eschert's Facebook friends included Senior Fire Investigator Williams as well as Chief Fire Investigator Wilkinson's wife, Taren Wilkinson, and Fire Investigator Bennett.

129.    According to the Van Laningham Report, Taren Wilkinson says she saw the First Facebook Post around the time it was made and told her husband Chief Fire Investigator

Wilkinson about it. He says he remembers Taren Wilkinson talking to him about the First Facebook Post in the morning.

130. On August 20, 2014, at approximately 7:36 a.m., someone took a screen shot of the First Facebook Post with an Android phone.

131. On August 20, 2014, a Facebook account was created at approximately 12:05 p.m. using the name "Linda Havery," just prior to the scheduled time for Council Member Fallon's tour of the 1517 North Graham Street building.

132. Upon information and belief, although both Senior Fire Investigator Williams and Fire Investigator Bennett both told Van Laningham that they were friends with Eschert on Facebook during this time and saw the First Facebook Post, neither of them advised Eschert that it was insensitive, inappropriate, racist, or in violation of City or Fire Department policies. At the time, Senior Fire Investigator Williams was Eschert's immediate supervisor.

133. Similarly, although Chief Fire Investigator Wilkinson told Van Laningham that he was aware of the First Facebook Post, he did not advise Eschert that it was insensitive, inappropriate, racist, or in violation of City or Fire Department policies.

134. Almost a week after the First Facebook Post, on August 26, 2014, at approximately 10:14 p.m. and again at 11:49 p.m., someone going by the name "Linda Havery" sent an email addressed to Chief Hannan and then-Charlotte-Mecklenburg Police Department ("CMPD") Chief Rodney Monroe ("Police Chief Monroe"), which claimed that an "email" was "floating around social media," that it had been on "Rev AL [sic] Sharpton fan page," and that "someone listed under her post ... [sic] look at this police officer and her racial comments."

135. This initial email from "Linda Havery" did not have the post attached. Both Chief Hannan and Police Chief Monroe received the initial email on August 26, 2014.

25

136. According to the Van Laningham Report, neither Chief Hannan's nor Police Chief Monroe's email addresses are readily available to the public.

137. "Linda Havery" forwarded a copy of the First Facebook Post to Police Chief Monroe's assistant, Major Sherie E. Pearsall ("Major Pearsall"), on August 27, 2014 at 7:56 a.m., without copying anyone else on the email.

138. On August 27, 2014 at 8:12 a.m., Chief Hannan forwarded a copy of "Linda Havery's" initial email to Deputy Chief Kinniburgh, stating that it was about an "arson investigator." He had only received the email from Major Pearsall forwarding the First Facebook Post one minute earlier.

139. Next, Chief Hannan forwarded the Pearsall email chain with the "Linda Havery" email and First Facebook Post to Deputy Chief Kinniburgh, copying the other Deputy Chiefs and HR Manager Kjeldsen, at 8:13 a.m.

140. Chief Hannan then emailed "Linda Havery" directly at 8:31 a.m. and thanked the person for reporting the First Facebook Post and stated that "this is a fire department employee and we are working on it right now!"

141. On August 27, 2014, at 11:44 a.m., Major Pearsall emailed "Linda Havery" and requested that "Linda Havery" telephone her.

142. The initial "Linda Havery" email claims that the post was seen on social media, including on Al Sharpton's fan page, but the screen shot of the post was of the original post and was taken within twenty minutes of the post being made. "Linda Havery" had no Facebook friends, was not Facebook friends with Al Sharpton, and was not following his fan page.

143. The initial August 26, 2014 "Linda Havery" email also claimed that "John Barrett is speaking on this young lady Friday at an Event …."

26

144.     John Barrett was a prominent civil rights activist and attorney who died on May 28, 2012 – over two years before "Linda Havery" email. He clearly could not have been scheduled to speak about Crystal Eschert's post in August or September of 2014.

145.     There is a local black or African-American civil rights activist named John Barnett ("Barnett"), but he was not speaking at an event that Friday either. Upon information and belief, when contacted by the *Charlotte Observer*, Barnett stated that he was not aware of Eschert or the First Facebook Post.

146.     On August 27, 2014 at approximately 7:26 a.m., Eschert shared on her private Facebook page an image that was making the rounds on Facebook (the "Second Facebook Post"). She did not create the image or write the post; rather, she simply shared it without posting any comments in support of or against the image.

147.     The image Eschert shared on her private Facebook page was originally posted by Law Enforcement Today and was part of a public debate at the time.

148.     The post by Law Enforcement Today expressed the opinion that the racial tension and cultural divide in America was worsened by a perceived disparity of responses by the President and "White House" to the deaths of law enforcement officers as compared to the response to the death of a young African-American man who was shot and killed by a police officer.

149.     The Second Facebook Post was a private expression of Eschert's personal opinion that law enforcement officers should be treated with the utmost respect as they have risked or sacrificed their lives to protect their community.

150.     In keeping with the Fire Department's social media policy at the time, Eschert's Facebook page did not at any point in time identify her as an employee of the Fire Department or

of the City, did not list her employment as part of her profile, and she did not post pictures of herself in uniform or other identifying clothing.

151. Thus, Eschert did not simultaneously identify herself on her personal Facebook page as a Fire Department employee when she made the First Facebook Post and the Second Facebook Post.

152. The August 27, 2014 image that Eschert shared as the Second Facebook Post was also shared by other employees of the City, including first responders whose Facebook accounts were public and which identified them as City first responders.

153. Upon information and belief, none of those other City employees have been disciplined or terminated for their posts of identical material.

154. On August 27, 2014, Fire Department management received another email from "Linda Havery" that shared a screenshot of the Second Facebook Post from approximately an hour earlier.

155. Upon information and belief, there is no "Linda Havery" who is a resident of Charlotte, North Carolina, or the surrounding metropolitan area.

156. In her investigation, Van Laningham could not locate anyone named "Linda Havery" using online searches, people finders, or records from the Register of Deeds offices in Mecklenburg and Cabarrus Counties.

157. Upon information and belief, although "Linda Havery" responded to two emails from Major Pearsall, no one at the City has ever spoken directly to "Linda Havery," nor has she been interviewed as part of any investigation related to her posts or Eschert's termination. Indeed, "Linda Havery" did not respond to either Major Pearsall's or Van Laningham's requests to telephone them.

158. Further, upon information and belief, "Linda Havery" has never responded to any attempts at communication made by any party after August 27, 2014.

159. Upon information and belief, the "Linda Havery" account was created by someone associated with the Fire Department solely for the purpose of complaining about Eschert's Facebook posts and was used as a pretext for discipline or termination in retaliation for Eschert's complaints.

160. Accordingly, the City did not properly investigate "Linda Havery" prior to terminating Eschert, as evidenced by the following:

a) The City has not explained the efforts made to verify the legitimacy of "Linda Havery" as a complainant;

b) The City never asked "Linda Havery" to provide a copy of the "email ... floating around social media;"

c) The City never asked "Linda Havery" to explain what was meant by "the public is throwing blows;"

d) The City never asked for a copy of the alleged references to Eschert or her posts on Al Sharpton's social media;

e) The City never asked what social media sites had references to Eschert or her posts;

f) The City never asked for information or evidence of the "heat from the public around the world;" and

g) The City did not provide evidence to the NCDOL of any efforts it made to verify the existence of "Linda Havery" or whether any of the information in the posts was accurate.

161. The City asked "Linda Havery" to call them and for copies of the post, but after "Linda Havery" sent them copies of the posts, the City did not ask her any other questions.

29

162. The City's actions between August 20, 2014 and September 25, 2014, were not consistent with the view that the posts were inherently prejudicial and threatened race relations in the City and the safety of the CFD and first responders, as the City now claims.

**Termination**

163. On August 27, 2014, at approximately 10:02 a.m., Chief Fire Investigator Wilkinson contacted Eschert and instructed her to come to Fire Department Headquarters to meet with him. Eschert had to arrange for child care before she could come in for the urgent meeting on her day off.

164. On August 27, 2014, Eschert met with Chief Fire Investigator Wilkinson, Deputy Chief Kinniburgh, and HR Manager Kjeldsen.

165. During the meeting, Eschert was asked to discuss the two Facebook posts that were the subject of the "Linda Havery" emails.

166. Eschert was told that the meeting was only for information purposes and by Deputy Chief Kinniburgh told her "we want to protect you." She was also told that the Fire Department would not be making an example of Eschert as a reaction to the postings or the "Linda Havery" emails, but that the subject of the emails had gotten to Chief Hannan, that it "has gone bonkers," and that "[they] don't like when the Fire Chief is involved."

167. HR Manager Kjeldsen told Eschert that they would "do what [we] can do as far as damage control" and that if it was her, she "wouldn't respond," she "would just let it go away ... Let it die. Let it go away."

168. During the meeting, HR Manager Kjeldsen acknowledged that Eschert's Facebook page was private and inaccessible by anyone other than her Facebook friends. HR Manager Kjeldsen stated that she had tried to access and view Eschert's Facebook page, but that it had been "totally blocked."

30

169.	HR Manager Kjeldsen also noted that she had searched Al Sharpton's page and could not find any reference to Eschert's post there.

170.	Eschert reminded HR Manager Kjeldsen, Chief Fire Investigator Wilkinson, and Deputy Chief Kinniburgh that her Facebook page had been completely private since 2010, four years prior to the First Facebook Post, when Eschert's name had appeared on the "hit list" of an inmate.

171.	Eschert explained that personnel from the bomb squad helped to make her page completely private for her protection. Chief Fire Investigator Wilkinson confirmed this.

172.	HR Manager Kjeldsen affirmed to Eschert that "you're entitled to your own opinion" and Deputy Chief Kinniburgh told Eschert "you're asking the same question that a large number of other people in America are asking."

173.	Eschert never intended to offend anyone by writing one post and sharing another. During the meeting, she expressed concern about the First Facebook Post and confusion over how it had gotten to "Linda Havery."

174.	Eschert also expressed concern over other coworkers inadvertently finding themselves in a similar position and said, "They need to be aware of this [social media policy] too."

175.	Eschert also expressed her hope that a speaking engagement by Barnett on the subject of Eschert's posts would not cause any more problems for the City.

176.	Chief Fire Investigator Wilkinson acknowledged that he could not find any events for that Friday where Eschert's post was to be discussed.

177.    Eschert cooperated in the discussion and understood at its end that she was not being disciplined but was being advised as to the social media policy for her own good and to "watch her back."

178.    During the August 27, 2014 meeting, Eschert asked for copies of the actual "Linda Havery" emails to be forwarded to her via email. She wanted to examine the metadata, and wanted complete copies of the screen shots of the posts. During the meeting Eschert received copies of the posts that were cropped and incomplete, but not copies of the email complaints.

179.    HR Manager Kjeldsen asked Eschert to prepare a statement about the meeting. Chief Fire Investigator Wilkinson and HR Manager Kjeldsen instructed Eschert to "type it at home," "print it," "delete it," and "don't email it," but to bring the hard copy to Chief Fire Investigator Wilkinson.

180.    Chief Fire Investigator Wilkinson said that Eschert's statement should not be sent to a City email account: "It don't need to come to a City email."

181.    After the conclusion of their meeting, Chief Fire Investigator Wilkinson handwrote his personal email address for Eschert so that she had it if she wanted to send her statement from her personal email address to him at his personal email address.

182.    Eschert was very uncomfortable with this request since she viewed it as evading the public records laws applicable to all City employees.

183.    On multiple occasions during and after the August 27th meeting, Eschert requested that the "Linda Havery" emails and attachments be forwarded to her electronically so that she could investigate the emails and the allegations of "Linda Havery."

184.    On August 27, 2014, when she was given notice of the meeting, Eschert contacted Ray Eschert to get his advice and assistance with childcare. Ray Eschert contacted Council

32

Member Fallon in advance of the meeting to see if she knew what was going on. He shared that Eschert had been summoned to a meeting uptown with management and HR and that he was concerned the City was retaliating against Eschert for her previous complaints to Council Member Fallon about the 1517 North Graham Street building, which was the impetus for Council Member Fallon's inspection of the building and many questions to Fire Department and City senior management.

185. Upon information and belief, in response to being contacted by Ray Eschert, Council Member Fallon contacted City Attorney Hagemann to report that Eschert was the whistleblower who instigated Fallon's inspection of 1517 North Graham Street, and that Fallon did not want the City to retaliate against Eschert. Upon information and belief, City Attorney Hagemann then spoke with Mayor Clodfelter and the City Attorney regarding this. City Manager Carlee then texted Chief Hannan to "do nothing about the social media case you showed me today until meeting with City attorney. It is already political. Use great caution."

186. On August 29, 2014, Eschert used her City email account to provide a written statement regarding the August 27th meeting to Chief Fire Investigator Wilkinson, HR Manager Kjeldsen, and Deputy Chief Kinniburgh. Eschert also included Chief Hannan on that email.

187. Eschert used her City email rather than her personal email because she believed that this was necessary in order to comply with public records access laws.

188. Eschert also shared her statement via email with her immediate supervisor, Senior Investigator Williams, who was not included in the August 27, 2014 meeting.

189. In her August 29, 2014 email regarding her statement, Eschert again requested copies of the "Linda Havery" emails.

33

190.    On or about September 2, 2014, Eschert finally received PDF copies of the documents containing the "Linda Havery" email allegations from HR Manager Kjeldsen with PDFs of the First and Second Facebook Posts. The copies of the posts appeared to have been printed and/or scanned in so that the tops were cut off, thereby deleting relevant information about the posts. In addition, without access to the metadata from the original email, Eschert could not determine when or how the screen shot was taken.

191.    On September 2, 2016, Chief Fire Investigator Wilkinson emailed HR Manager Kjeldsen, with a copy to Deputy Chief Kinniburgh, stating that it was his understanding that no disciplinary action was being taken against Eschert and that they had documented the fact that they had discussed the post with her.

192.    On September 3, 2014, Eschert emailed HR Manager Kjeldsen twice to again request that the information she had previously requested in the August 27, 2014 meeting and since, that the "original" emails from "Linda Havery" be forwarded to her.

193.    HR Manager Kjeldsen forwarded Eschert's emails to Chief Hannan and Deputy Chief Granger.

194.    On September 4, 2014, HR Manager Kjeldsen emailed Deputy Chief Granger stating that she "does not plan to respond" to Eschert's most recent email requesting that the "original" "Linda Havery" emails be forwarded to her.

195.    Upon information and belief, on September 15, 2014, Fire Department management received a public records request from Vice President Marty Puckett on behalf of the Charlotte Fire Fighters Association for a number of emails and text messages by or between Fire Department employees as they related to potential gender discrimination and the "Linda Havery" matter.

196. Upon information and belief, the next day, September 16, 2014, a meeting was held with senior Fire Department and City management to discuss Eschert's termination. The meeting was attended by City Deputy General Counsel Hope Root ("Attorney Root"), Chief Hannan, Deputy Chief Granger, Deputy Chief Kinniburgh, HR Manager Kjeldsen, CMPD Deputy Chief Kerr Putney (Deputy Police Chief Putney," and Deputy Fire Chief Pete Key ("Deputy Chief Key").

197. Upon information and belief, on September 18, 2014, Fire Department management received a public records request from Steve Harrison on behalf of the *Charlotte Observer*.

198. The City contacted Council Member Michael Barnes ("Council Member Barnes"), a black or African-American male, and Kojo Nantambu, then president of the Charlotte NAACP, and discussed the posts with them. Pursuant to City policy and state law, City management is not supposed to bring Council Members into personnel matters and they are not supposed to discuss internal personnel matters with third parties.

199. Upon information and belief, immediately thereafter, on September 19, 2014, Deputy Chief Kinniburgh, Deputy Chief Granger, Deputy Chief Key, Battalion Chief Daracus Newman ("Battalion Chief Newman"), Battalion Chief Stanley Reed ("Battalion Chief Reed"), HR Manager Kjeldsen, Attorney Root, and Deputy Director of Human Resources Sheila Simpson ("Deputy Director Simpson") met to further discuss termination of Eschert's employment.

200. Upon information and belief, on September 23, 2014, Eschert's termination was discussed in another meeting, which was attended by Deputy Chief Key, Battalion Chief

Newman, Battalion Chief Reed, HR Manager Kjeldsen, Attorney Root, and Deputy Director Simpson.

201.    Upon information and belief, as of that time, Senior Fire Investigator Williams, Chief Fire Investigator Wilkinson, and Deputy Chief Kinniburgh did not recommend Eschert's termination; rather, the decision came from above them in the chain of command.

202.    Upon information and belief, management for Eschert's department, the Arson Task Force, recommended suspension and diversity training, not termination.  Thus, they had no concerns about Eschert's credibility or her ability to testify in court.

203.    Upon information and belief, Chief Hannan tasked Deputy Chief Kinniburgh with signing the letter and delivering the news of Eschert's termination to her.

204.    On September 24, 2014, at approximately 10:30 a.m., Eschert was called to a meeting with HR Manager Kjeldsen, Chief Fire Investigator Wilkinson, and Deputy Chief Kinniburgh. Senior Fire Investigator Williams went with her to the meeting but was not allowed to stay.  At this meeting, Eschert was informed that she was being terminated and was handed a notice of Pre-Termination Hearing scheduled for 9:00 a.m. the following morning, giving her less than twenty-four hours' notice, in violation of City Police Code HR 22.

205.    Chief Fire Investigator Wilkinson and HR Manager Kjeldsen then took Eschert to the office and provided boxes for Eschert to pack all of her personal belongings before she left the building.

206.    The Recommendation of Termination and Notice of Pre-Termination Hearing cited violations of the Fire Department's rules and policies, and was accompanied by a Substantiated Misconduct Form.

207.    The Substantiated Misconduct Form, dated September 24, 2014, claimed that "Since the posts came to light, others outside of CFD have become aware of their existence and voiced concerns over the CFD's commitment to impartiality, including members of the department, IAFF Local 660, and Charlotte City Council Members."

208.    Upon information and belief, the Union had not complained about Eschert's Facebook posts.  Further, City Council Members should not have been solicited for input on personnel matters.  Upon information and belief, Hannan contacted both Council Members Barnes and Patsy Kinsey ("Council Member Kinsey") seeking their support to terminate Eschert.

209.    Upon information and belief, City Council Members Barnes and Kinsey have lobbied other Council Members to support Chief Hannan throughout the controversy surrounding Eschert's termination.

210.    On September 25, 2014, a Pre-Termination Hearing was held with Deputy Chief Granger, HR Manager Kjeldsen, and Sheila Simpson, City Deputy Director of HR.

211.    Despite her repeated requests, Eschert was not provided with electronic copies of the "Linda Havery" emails and attachments, so she was unable to adequately research them prior to the hearing.

212.    The City allowed Deputy Chief Granger to preside over Eschert's termination hearing.

213.    Allowing Deputy Chief Granger to preside over the hearing was a conflict of interest and essentially allowed the Fire Department to investigate itself. Indeed, Deputy Chief Granger had been involved in prior meetings about Eschert's termination, previously lived with Chief Hannan for several years, is a known ally of Chief Hannan, implements Chief Hannan's decisions, and worked closely with Chief Hannan to manage the Fire Department facilities and

37

properties, including construction and renovation projects, which were at issue in Eschert's complaints to Council Member Fallon.

214.   Upon information and belief, Deputy Chief Granger had his mind made up prior to the hearing as to how he would rule. His focus was solely whether Eschert had posted the two posts at issue on her Facebook, although Eschert never denied making the posts.

215.   Upon information and belief, all the false information in "Linda Havery's" emails and the City's failure to adequately investigate her and her allegations were and has been irrelevant to the City due to the Fire Department's motive to retaliate and senior City management and City Council's deferral to Chief Hannan's decisions.

216.   The same day as the hearing, Deputy Chief Granger affirmed Eschert's termination.

217.   Upon information and belief, Deputy Chief Granger falsely told the NCDOL and Van Laningham, and testified under oath at the Civil Service Board hearing on March 4, 2015 that the question of Eschert's discipline was left to Deputy Chief Kinniburgh. However, Deputy Chief Granger presided over Eschert's Pre-Termination Hearing and signed the September 26, 2016 letter officially terminating Eschert's employment. Upon information and belief, Chief Hannan had directed Chief Fire Investigator Wilkinson to find a reason to terminate Eschert. Providing false information on any City records with malicious intent or for personal gain is a Class A violation of Fire Department General Order 208.01.

218.   In his September 26, 2014 letter upholding the termination, Deputy Chief Granger repeated the policies Eschert allegedly violated verbatim. Deputy Chief Granger then stated, "It has been determined that you [sic] actions (Facebook posts) have caused the fire department's reputation in the community, and our commitment to serve the citizens impartially, to be brought

38

severely into question. Internal relationships have been strained. Additionally, your credibility as an impartial fire investigator has been diminished."

**Policy Violations and Procedural Inconsistencies**

219.    If Eschert's posts were considered a Class A violation of Fire Department General Order 208.01, the Fire Department failed to follow its own policies and procedures.

220.    If Eschert's posts were a violation of Fire Department General Order 208.01, Eschert should have been cited when her supervisors were first alerted to the posts and immediately relieved from duty until an investigation was conducted, and a Form 208A should have been completed.

221.    These actions did not occur; instead, Eschert was allowed to continue working and she was told that she was not being disciplined for the post.

222.    Additionally, if the City truly viewed the post as racist, it would have notified Eschert in the initial meeting with her on August 27th that her post was unacceptable because of racist content and that she would be fired as a result of the post; it would not have waited until 30 days later to terminate her employment.

223.    Eschert's post had to do with behavior rather than race; the post clearly said so. Indeed, the NCDOL Report says the City acknowledged that the post "was not directed to any specific person or group."

224.    Eschert's termination was the first time someone was terminated for a politically-charged or racially-charged social media post.

225.    Eschert did not violate the Fire Department social media policy. That policy, Fire Department General Order 208.08, instructs its employees as follows: "do not simultaneously identify oneself as a Charlotte Fire Department employee and send, solicit, or display materials

39

that could potentially be perceived as offensive including sexually explicit material, graphic depiction of violence, or material that offends or harasses on the basis of race, sex, religion, color, national origin, age, disability, military service, sexual orientation, gender identity or expression."

226.    Eschert's Facebook account did not identify her as a Fire Department or City employee; she did not post Fire Department-related photos.  It was clear that she was not speaking in an official capacity or on behalf of the City when posting comments or sharing posts to her personal Facebook account, which was accessible only by her Facebook friends.

227.    Upon information and belief, prior to Eschert's case, anonymous complaints from citizens about the Charlotte Fire Department or its employees to City management or the City Council had not been fully investigated and had not resulted in any disciplinary action or employee terminations.

228.    Upon information and belief, under Chief Hannan's management, anonymous complaints about the Fire Department which were sent to City Council and others were not appropriately investigated and did not result in appropriate action, for example, a 2013 anonymous letter about the promotional process in the Fire Department.

229.    Upon information and belief, there have been other serious anonymous complaints to senior City management and City Council about the Fire Department which have not been properly investigated.

230.    In addition, upon information and belief, complaints about the Fire Department and its management and the investigation and resolution of those complaints have not been shared with the public although they involved matters of public concern.

40

231.     Prior to Deputy Chief Granger's September 26, 2014 letter terminating Eschert's employment, no one from the community who was not anonymous expressed concern about Eschert's Facebook posts without being solicited by City representatives to do so and prompted for a response.

232.     Prior to Eschert's termination and to her knowledge, no internal or external relationships had been strained by her Facebook posts prior to their release by the Fire Department.

233.     Indeed, the only strain on relationships of which Eschert has been made aware are the result of Fire Department management's frustration over her health and safety complaints associated with the property located at 1517 North Graham Street and related Fire Department financial mismanagement.

**Public Records Requests and Post-Termination Grievance Process**

234.     These complaints by Eschert invited scrutiny upon Fire Department management's questionable practices by Ray Eschert and Council Member Fallon, and resulted in public records requests by the Charlotte Fire Fighters Association and the *Charlotte Observer*. Eschert's supporters prompted these requests since Fire Department management refused to provide her with the information and documentation she needed to defend herself in light of her termination.

235.     Upon information and belief, Fire Department management was motivated by Eschert's complaints to create a pretextual reason for her termination and to develop and carry out that plan in retaliation for these complaints.

41

236.    On October 7, 2014, the Fire Department received a request for reinstatement from Eschert, by and through counsel. Separately on the same date, Eschert made a public records request upon the City, by and through counsel.

237.    On October 9, 2014, Eschert submitted a Grievance to City Senior Human Resources Consultant Clyde Grant ("HR Consultant Grant") in which she objected to the grounds for the termination and to the process of the termination, and made a request for an impartial party to preside over her appeal.

238.    On October 13, 2014, the City received a second public records request from Eschert, by and through counsel.

239.    On October 17, 2014, Chief Hannan issued a letter to Eschert upholding the decision to terminate Eschert's employment. Chief Hannan claimed that the "Fire Department had no knowledge, nor was there any concern, about whom or what prompted the Arson Building tour by City Manager Carlee and a member of City Council," and that there was "no correlation between [Eschert's] complaint(s) about the newly renovated Arson Building and the disciplinary action taken in response to [Eschert's] Facebook posts." Again, the City allowed the Fire Department to investigate itself.

240.    Chief Hannan further stated in his October 17, 2014 letter that Eschert's "posting could be screen shot and uploaded to other social media sites," that Eschert's "postings were perceived as being racially offensive," and that Eschert's "comments [had] negatively affected the CFD's reputation in the community and damaged her credibility and impartiality."

241.    Chief Hannan claimed further that members of the Fire Department are held "to the highest standards and [are expected] to represent us in a manner that does not bring the Fire

42

Department into disrepute, reflect unfavorably, or impair the department's operation or efficiency."

242. Eschert's Facebook posts could not have negatively impacted the Fire Department's reputation in the community because they had not been viewed by anyone outside of the Fire Department and Eschert's Facebook friends, except as initiated by the City.

243. Eschert's Facebook posts did not negatively impact the operation or efficiency of the Fire Department because there were no repercussions in the community as a result of the emails from a person whose identity appears to be fraudulently created by someone within or associated with the Fire Department.

244. Any negative impact on the operation or efficiency of the Fire Department is a result of the Fire Department's own targeted and flawed investigation of Eschert's private Facebook postings in retaliation for her complaints about health, safety, and financial mismanagement, and resulting public records requests and public scrutiny.

245. The City has gone to extremes to attempt to justify its termination of Eschert, including the following allegations or assertions:

a) The First Facebook Post could put Eschert in danger;

b) The First Facebook Post could put all of the City's first responders in danger;

c) The First Facebook Post would be admissible in court to characterize Eschert as a biased witness; and

d) Arguing that fire investigators were held to a higher standard than firefighters although the same social media policies applied to both. Several other Fire Department employees shared the same Law Enforcement Today post as Eschert on their Facebook pages (the Second Facebook Post) without consequence.

246. No explanation has been provided by the City as to why Eschert's private Facebook posts put the Fire Department in more danger or were more inappropriate than other

43

posts by firefighters whose pages were public and which identified them as firefighters, including some who posted photographs with Fire Chief Hannan, photos from fire and accident scenes, photos of themselves in front of burning homes or structures, and photos and comments that were blatantly offensive and derogatory and that were directed to a specific person or group based on race, national origin, gender, sexual orientation, and gender identification.

247.    Eschert appealed her termination to the City Manager. The City Manager assigned Assistant City Manager Ann Wall to conduct the review of Eschert's termination.

248.    Before the City Manager's office issued a response, the City posted her job to secure her replacement on November 6, 2014.

249.    On November 18, 2014, Assistant City Manager Ann Wall issued to Eschert a letter upholding the termination and stating that this was the last step in the City of Charlotte's Grievance Process. Again, the City was allowed to investigate itself.

**Gender Discrimination**

250.    At the time of Eschert's termination, only three (3) out of thirteen (13) Fire Investigation staff members were female: two (2) senior level Fire Investigators and one (1) administrative assistant.

251.    Eschert is female.

252.    Chief Hannan, Deputy Chief Granger, and Chief Kinniburgh are male.

253.    Deputy Chief Kinniburgh, Chief Hannan, and Deputy Chief Granger treated Eschert less favorably than male employees because of her gender.

254.    HR Manager Kjeldsen told Eschert on August 27, 2014, that she was meeting with Eschert about her Facebook posts for informational reasons only and that the Fire Department would not make an example of Eschert.

44

255.    On September 24, 2014, Deputy Chief Kinniburgh issued to Eschert a Recommendation of Termination and Notice of Pre-Termination Hearing.

256.    On September 26, 2014, Deputy Chief Granger issued a letter to Eschert upholding the decision to terminate her employment.   Upon information and belief, the City prefers to defer to decisions by the Fire Chief and did so in this case by upholding his decision.

257.    On October 17, 2014 Chief Hannan issued a letter to Eschert upholding the decision to terminate her employment.

### Disparate Treatment – Other Facebook Posts

258.    Other Fire Department employees have made similar or obviously more offensive postings on Facebook with their Facebook accounts set to allow public viewing and unrestricted access to their posts, without consequence

259.    Deputy Chief Jeff Dulin ("Deputy Chief Dulin") is male.

260.    After Eschert was terminated, on or about February 14, 2015, Deputy Chief Dulin shared a Facebook meme that was deemed extremely offensive and derogatory to the transgender community. It targeted a specific individual and a group.

261.    Deputy Chief Dulin's Facebook post targeted Bruce Jenner (now Caitlyn Jenner) who, at the time, was widely rumored to be transitioning to a woman. The post included a picture of Bruce Jenner as featured on the cover of the 1977 Wheaties cereal box after his decathlon triumph at the 1976 Olympics with a second then-current photo of Bruce Jenner's face on a Froot Loops cereal box.

262.    Deputy Chief Dulin's Facebook post was shared to his Facebook friend community, the same as Eschert's Facebook posts.

263. There was a public outcry and significant media attention as a result of Deputy Chief Dulin's bigoted post.

264. At the same time, an audit was released by the City showing missing documentation and payment duplication in travel expenses, which resulted in an overpayment of $2,750 to Deputy Chief Dulin, which he was then required to repay to the City.

265. According to the audit, Deputy Chief Dulin's overpayment was over five times higher than that of any other employee identified in the audit.

266. Dulin was not terminated for his social media policy violation as Eschert was. Instead, the City assisted him in making a public apology through the media and allowed him to retire.

267. Indeed, two other male firefighters shared the exact same image on their public Facebook timelines that Eschert shared in her Second Facebook Post, while also simultaneously identifying themselves as Fire Department employees and having posted photographs of themselves in uniform, without any repercussions.

268. One other male Fire Department employee who identified himself as a Fire Department Captain and posted photographs of himself on his public Facebook page in uniform "liked" the image shared by one of the male firefighters.

269. Other examples of comments and memes posted and shared on Facebook by unpunished Fire Department employees whose Facebook pages are or were public and who simultaneously identified themselves as Fire Department employees include:

   a) One individual who commented "Society really let this woman down ... by not having her neutered 14 kids ago," and shared a video of an interview on a nightly news program with a black mother who had fifteen children and was in need of assistance after her fiancé was arrested in providing basic necessities including shelter and food for twelve of her children. This is particularly disturbing given North Carolina's dark history of targeting black women with its eugenics program;

46

b) One individual who referred to black teenagers in a news story as "pieces of crap thugs;"

c) One individual who commented favorably on a video entitled "Niggas [sic] with daughters be like..." which depicted a black father and his friend intimidating his daughter's first date with threatening language, behavior, and a gun;

d) One individual who shared a story entitled "Have you heard mainstream media screaming about the white cop killed by a black career criminal a few days ago? Yeah, I didn't think so," which highlighted a perceived racial disparity of media coverage focusing on police shootings involving white police officers shooting black victims and ignoring shootings involving black suspects shooting white police officers, which was similar in theme to Eschert's First Facebook Post;

e) One individual who shared a cartoon of a police officer (whose uniform has a patch saying "to protect *sometimes with my life* and to serve") glaring at a news anchor being filmed by a cameraman representing "questionable journalism" saying "We will continue to report subtle insinuations that all police officers are racist thugs and militarized soulless drones to boost our ratings – so stay tuned!" This meme using the word "thug" was also shared by a Fire Investigator and a CMPD Detective, who also worked out of the Arson Task Force building, whose pages were set to the same privacy setting as Eschert.

f) One individual who posted a video captioned "Mob of Black Teens in Tennessee Beat Two Grocery Employees" and commented "I wonder if Al Sharpton or Jessie [sic] Jackson will go speak up for the guy who got jumped by the mob????;"

g) One individual who posted "The facts keep coming out," referring to an article which was shared about Officer Wilson's account of the shooting of an unarmed black man in Ferguson, Missouri; and

h) One individual who shared a famous image of Uncle Sam with the meme "I am NOT your baby daddy; get a job, get off welfare and take responsibility." This same individual shared a photo of himself with Chief Hannan while both were in uniform and even used it as his profile picture.

270.    Upon information and belief, all of the posts mentioned in the previous paragraph were posted by men. Most of the Facebook users who violate the Fire Department's and the City's social media policies are men. None of them are known whistleblowers, and none of them have been terminated.

47

271.     Neither the Fire Department nor the City responded to Eschert's Facebook posts in a manner comparable to those of her non-whistleblower male counterparts.

272.     Indeed, the NCDOL Report states that the City identified five employees who were disciplined for their Facebook posts. None of them were terminated as a result, and only one was put on probation:

   a.  Employee 1 (Deputy Chief Dulin): He was reprimanded, suspended without pay, put on performance probation, assisted with issuing a formal apology, and attended diversity awareness and sensitivity training. Although his post directly targeted a specific individual and group, he was a senior manager, and had previously committed a serious policy violation when he submitted improper expenses for reimbursement and later had to pay the money back to the City in 2014. He was not terminated;

   b.  Employee 2 (a Charlotte Area Transit System employee), Employee 3 (a Neighborhood & Business Services employee), and Employee 4 (a 311 employee): All were issued written reprimands. Plaintiff does not have copies of their posts; and

   c.  Employee 5 (CATS): This employee received three months' probation.

273.     Upon information and belief, the City did not disclose to the NCDOL that another male firefighter other than Deputy Chief Dulin posted something derogatory to lesbians and was disciplined, but not terminated.

274.     In addition, two anonymous emails were sent to the City Manager and City Council Members from antiquefiretrucks@gmail.com with many offensive and discriminatory public Facebook posts by City employees including many first responders, on or about December 30, 2015, and February 29, 2016. However, upon information and belief, none of these employees have been terminated.

48

## Credibility Issues and Retaliation Against Eschert's Witnesses and Supporters

275.    The City claims that only Fire Investigators are required to testify in arson cases. That is not true: Anyone from the Fire Chief down to firefighters, as well as any other first responders, can be called on to testify in a court of law.

276.    A challenge to credibility allowed in court is generally based on dishonesty, not personal opinion. There are significant credibility issues at the top of the Fire Department chain of command, including Chief Hannan and Deputy Chief Granger.

277.    The Van Laningham Report found that "[a] common theme that [was] encountered is a distrust of the command staff, specifically Chief Hannan and Deputy Chief Granger, by many in the Fire Department."

278.    If the Fire Department is worried about Eschert's credibility in court, than City management should be much more worried about Fire Department management's credibility in court based on a pattern and practice of dishonesty by senior Fire Department management.

279.    Deputy Chief Granger falsely claimed that Deputy Chief Kinniburgh and Chief Fire Investigator Wilkinson decided Eschert's discipline, which is not true; they did not recommend termination.

280.    Deputy Chief Granger claimed under oath at the Civil Service Board hearing on March 4, 2015 that only he and HR Manager Kjeldsen prepared and reviewed the September 26, 2014 termination letter and that no one else reviewed or approved the letter before it was issued.

281.    Chief Hannan claimed under oath at the Civil Service Board hearing on March 4, 2015 that he did not make the decision to terminate her and was not asked for input before the decision to her termination her was made by Deputy Chief Kinniburgh and Chief Fire Investigator Wilkinson.

282.    Upon information and belief, Chief Hannan directed Deputy Chief Wilkinson to find a reason to terminate Eschert and for Deputy Chief Kinniburgh to issue the September 24, 2014 letter citing Eschert for termination although Wilkinson recommended discipline less than termination.

283.    Pursuant to Fire Department General Order 208.03 III(B)(1)(c), "[t]he Fire Chief, pending Civil Service Board approval when necessary, will have the final decision on suspensions, demotions and/or terminations."

284.    When Ray Eschert met with Chief Hannan in his office regarding Public Information Officer Rob Brisley's upcoming January 2014 retirement party, Chief Hannan not only acknowledged that he knew who Ray Eschert's daughter-in-law was, but also complimented her performance.

285.    Upon information and belief, later, Chief Hannan falsely claimed that he did not know who Eschert was prior to receiving the email from "Linda Havery." Yet he told Major Pearsall he knew who Eschert was prior to his receipt of the First Facebook Post.

286.    The credibility of both Chief Hannan and Deputy Chief Granger has also been called into question based on their willingness to lie to retaliate not only against Eschert, but against her known supporters as well, including Fire Department employees Puckett and Tom Brewer ("Brewer").

287.    Sometime prior to March 27, 2016, Chief Hannan leaked an internal personnel memorandum about Puckett to the press although the memorandum was explicitly labeled "confidential" and denied doing so to senior City Management before finally admitting to City Manager Carlee that he was responsible for doing so.

50

288.     Puckett, also the Vice President of the Charlotte Firefighters Association Local 660, was reprimanded and threatened with termination from his position with the Fire Department for also serving as an unpaid intern to Council Member Fallon, and is now banned from accessing the 15th floor of the City Center when he is off duty. The 15th floor houses the offices of the City Manager, City Attorney, Assistant City Managers, and Council Members; being banned impedes his participation in the political process.

289.     When Chief Hannan was asked by a local television reporter on Monday, March 28, 2016 – upon information and belief, after Chief Hannan had already confessed to the leak to City Manager Carlee – about whether Chief Hannan had in fact leaked the memo, his immediate response was "No." Fire Department Spokesperson Cynthia Sha-Khan said on Friday, April 1, 2016, that Chief Hannan didn't say he didn't release the memo during that television interview, but rather that he was telling the television reporter that he didn't have any information about the investigation that he could share at that time. However, at the time Chief Hannan said "no" to the reporter and denying he had leaked the confidential personnel memorandum, Chief Hannan had already admitted doing so to City Manager Carlee.

290.     By Tuesday, April 5, 2016, Chief Hannan was placed on a three-month probation and had a reprimand placed in his personnel file by City Manager Carlee. Chief Hannan further claimed that he had "mistakenly understood that all topics discussed at that [Friday, March 4, 2016 meeting with the Assistant City Manager and members of the City Attorney's office], including the memo, had previously been made public through the actions of others."

291.     North Carolina has very strict laws on who can release documents from an employee personnel file: only Puckett himself can release documents from his own personnel file, and he did not do so, nor did he authorize such a release by the City. Further, the Fire

51

Department has its own General Order signed by Chief Hannan, which defines the release to third parties of confidential personnel information as a violation of State law.

292.    Additionally, Chief Hannan admitted that Deputy Chief Granger claimed that Brewer had an affair with another City employee without basis, and Chief Hannan also admitted spreading the information to another department head. Upon information and belief, the allegation about the affair was false and Deputy Chief Granger and Chief Hannan knew it was false or were recklessly indifferent to the falsity of the allegation.

**Disparate Treatment - Use of the Word "Thug"**

293.    According to the Van Laningham Report, the primary reason the City objected to the First Facebook post was based on the use of the word "thug," which the City now claims is "exceptionally derogatory" to African-American males.

294.    However, both President Barack Obama and former Mayor Pro Tem Michael Barnes ("Mayor Pro Tem Barnes"), both of whom are African-American males, used the term "thug" in the same way as Eschert: as a reference to criminals.

295.    The available definitions of the word "thug" are as follows:

    a)  Brutal ruffian or assassin;

    b)  Gangster;

    c)  Thief;

    d)  Violent person; and

    e)  Criminal.

296.    Even the urban and slang definitions do not characterize the word as a derogatory reference applicable solely to African-American males.

52

297.    Moreover, John Barnett, who presumably is the local Charlotte African-American civil rights leader with alleged ties to Al Sharpton referenced in the "Linda Havery" emails, refers to his organization as T.H.U.G. Civil Rights (True Healing Under God).

298.    Upon information and belief, in contrast to Eschert, Mayor Pro Tem Barnes was not reprimanded, disciplined, or censured as a result of his usage of the word "thug" to refer to criminals during a City Council meeting.

## Van Laningham Report and Management Partners Report

299.    As referenced above, in or about November or December 2014, the City commissioned an independent investigation to be performed by Allison Van Laningham of Greenboro into the Fire Department's termination of Eschert and her claims of retaliation.

300.    On April 27, 2015, the independent investigation was completed and titled the "Independent Investigation Report," but commonly referred to as the "Van Laningham Report."

301.    On April 28, 2015, the City released the Van Laningham Report to the public. The report included the following conclusions:

  a) "Based on our investigation, it appears clear that there is an atmosphere of distrust among many within the Fire Department." "Many gave voice to a fear that appears widespread that any action deemed undesirable by certain members of the command staff will result in targeting and discipline."

  b) There was "an atmosphere within the Arson Task Force of insecurity and suspicion."

  c) "The history and treatment, both real and perceived, of the fire investigators causes that group to believe that its members could be targeted for discipline and that Crystal Eschert may have been targeted for termination." "It appeared to us that there is significant stress among the fire investigators about their working conditions as well as significant fear that stepping on toes or doing anything deemed to be out of line would result in negative action against them."

  d) "A common theme that [was] encountered is a distrust of the command staff, specifically Chief Hannan and Deputy Chief Granger, by many in the Fire Department."

53

e) Fire Department employees "stated that if these members of the command staff are crossed, they will find a way to administer punishment."

f) Employees stated "that it was a reality within the Fire Department, and particularly with respect to fire investigators, that if you upset certain people you would be targeted for discipline and punishment." "Multiple members of the Arson Task Force told us that, in their experience, if an employee crosses the command staff, swift punishment is imminent."

g) Employees have "strongly-held beliefs that dishonesty would be used as needed to bring about a desired result." "The expressions of distrust are in no way singular and contribute significantly to low morale, frustration and suspicion."

h) Eschert was known as a "de facto spokesperson" for the concerns about the building located at 1517 North Graham Street. "Certain of Ms. Eschert's coworkers viewed her as a serial complainer who would circumvent the chain of command to make her voice heard – a trait that they believed could have drawn negative attention to her."

i) Two investigators admitted warning Eschert that she would have a target on her back for vocalizing her complaints.

j) Regarding the "Linda Havery" emails, the circumstances lead to a conclusion that the complaint was made for the purpose of creating trouble for Eschert rather than for a legitimate purpose.

k) The timing of the emails was an issue.

l) The process was flawed and viewed as atypical with respect to the scope and structure of the process, particularly the number of people involved" and the fact that "every person who would ever review her employee grievances had participated in one or more meetings regarding how her discipline should be handled."

m) That "there is no assurance that the employee grievance portion of the process provided Ms. Eschert with a meaningful review of the termination decision."

n) The process that was applied to Eschert "exacerbate[d] the atmosphere of distrust" that was found present in the Fire Department; and

o) Chief Hannan denied knowing Eschert before her Facebook posts, despite evidence that he did know both Eschert and her father-in-law, Ray Eschert.

302. Significant issues that are underscored by the Van Laningham report are: 1) timing–the first "Linda Havery" email is six days after the First Facebook Post; 2) content–many

54

inaccuracies in the content, for example nothing was being discussed on Al Sharpton's page and Eschert was not being spoken about by John Barrett, the civil rights leader who was dead at the time, or John Barnett, civil rights activist in Charlotte; and 3) non-responsiveness—once Chief Hannan was involved, "Linda Havery" did not respond to any further emails and never provided her phone number or called back anyone who asked for a return call about the matter.

303. The City also commissioned a second independent assessment of the Fire Department's management practices, which was separate from the Eschert investigation and was conducted by Management Partners. On April 27, 2015, the assessment was completed and titled the "Fire Department Management Systems Review" (the "Management Partners Report").

304. On April 28, 2015, the City also released the Management Partners Report to the public concurrently with the Van Laningham Report. The report included the following findings:

a) "Many employees indicated that application of the discipline process is not consistent across work units or across different levels of staff...;"

b) "Many [focus group] participants indicated they are uncomfortable providing feedback that is contrary to the chief's ideas because there is fear of possible retribution;"

c) There is a "fear of retribution if people speak out...[that] was a theme throughout the focus groups and the employee survey;"

d) Multiple participants "expressed the opinion that [Chief Hannan] sometimes says what he thinks staff wants to hear and then does something else;"

e) There is evidence that "minorities and women are under-represented in the department," and that the gender composition was 8% in 2008 and 7% in 2015;

f) There is a "lack of positive communication from the chief;"

g) "Gag orders are issued to prevent communication;"

h) "Highest level [employees] in the organization exhibit poor managerial behavior and there is no accountability;"

55

i) "One infraction will get three different results;"

j) "Retaliation was not prevalent under [the] old chief;"

k) "Investigations are not documented or supported by policy;"

l) "We are treated like a sworn officer but aren't given the benefits of civil service;" including no formal grievance process for civilians ineligible for Civil Service Board review; and

m) "Retaliation takes many forms. You might get transferred or just have a target on your back forever if you challenge the system;"

## NCDOL Investigation

305.    On or about March 24, 2015, the NCDOL issued a report on its investigation into

Eschert's complaint of retaliation as a result of her complaints about and health and safety issues.

306.    The NCDOL's report included the following excerpts from interview summaries:

a) "If you complain, they will terminate you;"

b) Eschert was told that she "had no business and it was not [her] place" to get involved;

c) "[Carlee] lied because [he] said [Council Member Fallon] was happy with the building when [she] finished the tour. In reality, [Council Member Fallon] had told [Van Laningham] [she] would not put a pig in that building;"

d) "Complainant was terminated because [she] was the whistleblower. The Department said that it was because of [her] Ferguson comment, but if you look in Facebook, firefighters write things worse than [her] comment and they are not fired;"

e) "The Fire Department gets rid of anybody that complains;"

f) "Is there a general fear in the Department that if anybody complains about safety they will be targeted by Management?" "I think so, if you do not go through the chain of command, you will be remembered;"

g) "If anybody complains, they will encounter retaliatory discipline or targeting and Respondent will lie to put anybody in a bad situation;" (Emphasis added.)

h) "It was unknown to [some] that the department was splitting money without telling the City Council. [Eschert] exposed what they were doing without council's approval.

56

...Respondent was doing things 'through backways' so nobody would ask any questions;"

i) [One employee who was interviewed] "didn't find [Eschert's] post derogatory or prejudicial. [Management] only asked black managers so they could predetermine the outcome. Respondent 'was getting the answers they wanted.' ... The post had nothing to do with race but behavior;"

j) [Eschert] "was terminated because [she] had the audacity to question what they were doing with the building. [It's] consistent with their prior behavior. We fire women;"

k) If Eschert had "kept [her] mouth shut 'all this would have gone away;'"

l) "Complainant's page was closed to the public and [it] did not identify [her as a City employee ... it was retaliation;"

m) "When you looked at other employee's posts, there is no consistency;"

n) "Discipline should be standard and without inconsistencies;"

o) "They don't like females questioning anything. [Another female employee] was also terminated. The records speak for themselves. They didn't think [Eschert] would go this far. People in charge are narcissistic and don't like to be questioned;"

p) There is a culture in the fire department that if you got on the bad side of management, that might not be the best or in your favor;"

q) "They were asked not to say the word 'renovation' and that it was just maintenance work;"

307.  The NCDOL's report included the following findings:

a) That Complainant engaged in protected activity;

b) That while Respondent denied "knowledge" of protected activity, it was established during the investigation that "Several of the witnesses that were interviewed acknowledged that" her complaints and concerns were "voiced several times;" that her complaints were "acknowledged;" that other employees were aware of the contents of her email listing her complaints but "would not sign it to make it official;" that "several witnesses mentioned that Complainant was talking" with others who had ties to community and City Council members about her complaints; and that at least one fellow employee was "on board;"

c) That "Complainant was terminated on September 25, 2014;" and

d) That "The temporal proximity in this case is <u>highly suspect</u> given the closeness of the Complainant's termination in regards to [her] protected activity." In addition, if her "posting was considered a violation class 'A,' <u>the department failed to follow their own procedures</u>." She should "have been relieved of duty until an investigation was conducted or 'Form 208 A' would have been filled out." Instead, she was told that she "would not be disciplined" over the posting. Further, Respondent quoted its Social Media policy "as one of the causes for termination. The policy clearly states: 'Do not <u>simultaneously identify</u> oneself as Charlotte Fire Department employee and … display materials that could potentially be perceived as offensive ….' <u>Use of this policy is Pretext: Complainant's posting of Facebook page did not indicate anywhere [that she] was a [Fire Department] employee.</u>" (Emphases added). Also, Complainant's being told to use personal rather than City email to respond about the Facebook posting "seems extremely unusual and shady since if the post was going to be used for disciplinary action [she] would have been asked to use [official City] email in order to keep a record of the actions taken by the Department." Eschert received a "favorable evaluation report" "prior to [her] whistleblowing activities in which they praised [her for her] work and character. During the interviews, both depicted Complainant as a completely different person which disputes the credibility of [them]. Respondent failed to prove that anybody tried to verify [Linda Havery's] identity or the veracity of [the] statements. … Respondent also states [Linda Havery] is probably an alias for one of Complainant's friends, which makes me think that there is possibility [Havery] was somebody form [sic] the Fire Department or as one of the witnesses said, it was an extremely big coincidence and very 'convenient' for the Department." Further, Respondent makes a number of claims that are contradictory even to its own statements. Respondent also claimed that Eschert's termination was upheld "because [she] was unable to present any evidence of significance to overturn the findings of the investigation. However, Complainant was given only one day to prepare for [her] pre-termination hearing and find available witnesses." Respondent further "acknowledges that Complainant's post 'was not directed to any specific person or group.' While Respondent "states the post 'has been perceived by members of community, city organization, and fire department as prejudice,'" it "fails to explain why, if the post was seen as prejudicial to the fire department, the department failed to take any action against Complainant from the beginning …." Also, other City employees have been disciplined for social media posts but "<b><u>NONE have been terminated</u></b>." (Emphasis provided.) "Complainant was not treated the same way" as others for similar or identical offenses, and Respondent was "unable to explain why." "Complainant never had the chance to have [her] appeal looked at by an impartial or new person. … [T]he same people that were involved in the meetings discussing Complainant's termination were the people that reviewed [her] appeals." "Complainant was not provided a copy of ["Havery"'s] emails in a timely manner" despite requesting them "on several occasions." "The proximity in time between Complainant's protected activity and the adverse action is <u>highly suspicious</u>." (Emphasis added.) Also, the "disparate treatment" was made clear in the NCDOL decision: "termination was never found appropriate until Complainant's case. Based on the foregoing, <u>there is sufficient evidence to show that</u>

58

a violation of REDA may have occurred. ... Respondent's defense is not supported by the greater weight of the evidence." (Emphasis added.)

308. The NCDOL report issued a finding of cause that there was more than enough evidence to conclude that the City had wrongfully terminated Eschert in violation of N.C. Gen. Stat. § 95-241 *et seq.*

309. The retaliation against Eschert as a result of her health and safety complaints was part of a pattern and practice of behavior by Fire Department management.

**COUNT I**
**(First Amendment Violation – The Complaints of Risks to Health and Safety**
**and of Financial Mismanagement)**

310. The allegations of the previous paragraphs are realleged and incorporated herein by reference.

311. Plaintiff has the right, protected under the First Amendment to the U.S. Constitution, to speak as a citizen on matters of public interest, including matters relating to the risks of health and safety of the Fire Department and its employees, and matters relating to the financial mismanagement associated with the Fire Department's buildings.

312. When her concerns were not addressed internally by Fire Department management, Eschert complained to Ray Eschert who involved Council Member Fallon.

313. When she complained to Ray Eschert and Council Member Fallon, Plaintiff was exercising that right to free speech.

314. Plaintiff has the further right under the First Amendment not to be punished or retaliated against by her employer for speaking out as a citizen on matters of public interest and concern, or for engaging in protected expressive activity.

315. Plaintiff spoke on a matter of public concern when she shared her knowledge of the unacceptable condition of the building located at 1517 North Graham Street with Ray Eschert

59

and Council Member Fallon. Plaintiff's interest in expressing these concerns was primarily to protect the lives and health of Fire Investigators and other Fire Department employees. Plaintiff's secondary concern was that the Fire Department was mismanaging funds while failing to invest in the renovation of the Arson Task Force building to avoid allowing employees to work in an unsafe or unhealthy environment. She was concerned about waste of public funds and the emphasis on large expenditures for extravagant and unnecessary cosmetic improvements to the new Fire Department Headquarters building over health and safety for other buildings housing Fire Department employees who were lower in the chain of command, many of whom worked twenty-four hour shifts and would spend the night in the building assigned to them.

316. Plaintiff's speech is a matter of public concern because it exposed both actual and potential wrongdoing.

317. Plaintiff spoke as a private citizen and not as an employee, because her official job duties were to investigate the source and origin of fires and did not entail enforcement of health and safety standards, building codes, inspections, or permits, or financial mismanagement of Fire Department funds.

318. The Fire Department's interest in maintaining discipline and ensuring harmony as necessary to the operation of its mission of promoting public safety was not impaired by Plaintiff's speech.

319. The legitimate interests of the Fire Department do not include secretly wasting and mismanaging funds or endangering the lives and health of Fire Investigators and other Fire Department employees.

320. Plaintiff's interest in expressing these concerns did not compete with the Fire Department's interest in providing efficient and effective services to the public. Rather, to the

extent that Plaintiff's speech created any perceived risk to the Fire Department's interests, any such apprehension was unreasonable and was outweighed by Plaintiff's meritorious interest.

321. The Fire Department terminated Plaintiff in retaliation for her speech about the problems of health and safety, and financial mismanagement.

322. The Fire Department's stated reason for terminating Plaintiff, because she violated the Fire Department's social media policy, is a mere pretext for its actual reason: that she brought unwanted scrutiny to the Fire Department's mismanagement of its facilities and finances, and to the Fire Department's relationship with City management and City Council.

323. The actions of the Fire Department and the City, as described above, violated Plaintiff's rights. The Fire Department fired Plaintiff because she engaged in speech protected by the First Amendment, as punishment for that speech, and did so without any legitimate justification, and the City deferred to that decision.

324. As a result of that violation of her First Amendment rights, Plaintiff has been injured. Plaintiff has lost her job and her medical insurance. She has been punished for her protected speech, and her exercise of that right has been improperly chilled.

325. As a result of Defendant's actions, Plaintiff is entitled to have and recover all damages including reinstatement, compensatory, back pay, front pay, benefits, the costs of this action and attorney's fees, pursuant to 42 U.S.C. § 1988.

## COUNT II
### (First Amendment Violation – The Facebook Postings)

326. The allegations of the previous paragraphs are realleged and incorporated herein by reference.

327. Plaintiff has the right, protected under the First Amendment to the U.S. Constitution, to speak as a citizen on matters of public interest, including matters relating to the conduct of police and its racial ramifications.

328. When she posted on Facebook on August 20, 2014, Plaintiff was exercising her rights under the First Amendment.

329. Plaintiff has the further right under the First Amendment not to be punished or retaliated against by her employer for speaking out as a citizen on matters of public interest and concern, or for engaging in protected expressive activity.

330. Plaintiff clearly spoke as a private citizen when she posted on Facebook because her official job duties do not involve any social media or other similar public commentary, and her page was available only to her personal friends with privacy settings that prevented all but the most deliberate attempts to access her posts without her permission.

331. Plaintiff spoke on a matter of public concern because her Facebook postings were commentary about events that were of national awareness and public debate. Her postings were part of a larger conversation about law enforcement.

332. Plaintiff's interest in exercising her First Amendment right to express her perspective on this matter of public concern far outweighs the interest of the Fire Department and City in providing efficient and effective services to the public because Plaintiff's postings were made in a private forum; the Fire Department and City did not have a reasonable apprehension of injury to its reputation or impairment to its operations because of Plaintiff's postings.

62

333. The Fire Department and City have not shown that the complaints it received by email from a "Linda Havery" were sent by a real person outside of the Fire Department or City management.

334. The Fire Department and City did not properly investigate the "Linda Havery" emails or the clearly false and inaccurate statements in those emails. Because the Fire Department was determined to retaliate against Eschert, the truth and accuracy of "Linda Havery's" emails was deemed irrelevant.

335. The Fire Department and City did not have an adequate justification for treating Eschert differently from any other member of the general public as a result of her Facebook postings.

336. The Fire Department and City have not shown that there was ever any risk of harm to the Fire Department's reputation or to its ability to efficiently provide public services because of Eschert's postings.

337. The Fire Department and City created the only purported risk of harm to its reputation and ability to provide public services by its own deliberate airing of the postings by showing them to multiple persons both within and outside the Fire Department.

338. The Fire Department has allowed other, more clearly public, and more clearly harmful, statements and postings to go unpunished or to receive lesser punishment.

339. Upon information and belief, the Fire Department did not consistently enforce its social media policy against the expressions of others, even where those expressions clearly violated its policy.

63

340.     Upon information and belief, the Fire Department did not reasonably apprehend that Plaintiff's speech would actually disrupt its operations or impact its reputation in any appreciably negative way.

341.     The Fire Department claims that it terminated Eschert's employment because her Facebook postings violated the Fire Department's social media policy, but the Fire Department merely used the Facebook postings to create a pretextual reason to terminate Eschert in retaliation for her prior, protected expressions regarding concerns about risks to health and safety and also about financial mismanagement by the Fire Department.

342.     As a result of this violation of her First Amendment rights, Plaintiff has been injured. Plaintiff has lost her job and her medical insurance. She has been punished for her protected speech, and her exercise of that right has been improperly chilled.

343.     As a result, Plaintiff is entitled to have and recover all damages including reinstatement, compensatory, back pay, front pay, benefits, the costs of this action and attorney's fees, pursuant to 42 U.S.C. § 1988.

**COUNT III**
**(Wrongful Discharge in Violation of Public Policy –**
**North Carolina Constitution Article 1, §§ 1 and 14)**

344.     Plaintiff complained to Council Member and Committee on Community Safety Chair Fallon, and provided to her information about the Fire Department's health and safety risks, failures to obtain building permits, and financial mismanagement, each in reference to the building located at 1517 North Graham Street.

345.     As set forth above, Plaintiff engaged in a protected activity when she exercised her constitutional right to free speech by speaking as a private citizen on a matter of public concern when she made her complaints to Council Member Fallon and Ray Eschert.

64

346.    The Fire Department's management knew that Plaintiff had complained to Council Member Fallon and Ray Eschert when the City, senior City officials, and Members of City Council decided to terminate Plaintiff's employment.

347.    As set forth above, Plaintiff engaged in protected activity when she exercised her state constitutional rights to free speech, as guaranteed by §§ 1 and 14 of Article I of the North Carolina Constitution, in the following actions:

a) In complaining to Council Member Fallon and Ray Eschert that the Fire Department was risking the health and safety of its employees by performing inadequate renovations to its buildings without proper permits and inspections, and that the Fire Department was mismanaging its publicly provided funds by improperly allocating and spending money on wasteful projects; and

b) In posting to her private Facebook page her views on the national ongoing conversation about law enforcement, its operations, and its racial ramifications in communities.

348.    Plaintiff's state constitutional rights, as alleged above, were clearly established at the time of Defendants' violations, and a reasonable manager in Chief Hannan's position would have known that his conduct violated Plaintiff's rights.

349.    The above actions, described herein, were not part of Plaintiff's official duties or within the scope of her employment as a Fire Investigator.

350.    In taking the above actions, described herein, Plaintiff exercised her rights to free speech on matters of immense public concern to the community.

351.    The Fire Department targeted Plaintiff and terminated Plaintiff because she complained to Council Member Fallon and Ray Eschert and in violation of her constitutional rights.

352.    The Fire Department's stated reason for terminating Plaintiff's employment for violating its social media policy is a pretext for its actual decision to terminate Plaintiff in retaliation for her complaints and in violation of her constitutional rights.

353.    Upon information and belief, even if the Fire Department did terminate Plaintiff only because of her alleged violation of Defendant's social media policy (as it claims to have done), Defendant would not have terminated Plaintiff for this reason if she had not complained.

354.    Upon information and belief, Defendant also selectively enforced its social media policy by terminating Plaintiff, ostensibly in response to her Facebook postings, which Defendant deemed offensive to a level justifying termination, but has not terminated any or even punished the vast majority of other offenders whose social media activity was more obviously offensive than that of Plaintiff, and whose activity was publicly viewable and actually viewed, in contrast to that of Plaintiff's activity prior to her termination.

355.    When it terminated Plaintiff, Defendant either intended to cause or was recklessly indifferent to the likelihood that its conduct would cause severe emotional distress to Eschert.

356.    Defendant's conduct did in fact cause severe emotional distress to Plaintiff, including anxiety, mental anguish, and sleeplessness, for which she sought treatment.

357.    Defendant, through its employees and agents, violated the public policy of North Carolina prohibiting employment discrimination on the basis of expressive activity protected by the freedom of speech granted under the North Carolina State Constitution, Article I, §§ 1 and 14.

358.    As a direct and proximate result of Defendant's unlawful conduct, Plaintiff is now and will continue to be unlawfully deprived of income in the form of wages, compensation, and other monetary and non-monetary benefits due to her, in amounts to be proven at trial.

66

359.    As a result, Plaintiff is entitled to have and recover all damages from Defendant in an amount in excess of twenty-five thousand dollars, ($25,000) to be proven at trial, including reinstatement; direct consequential, general, compensatory, special, and emotional distress damages; back pay; front pay; prejudgment interest; and the costs of this action.

### COUNT IV
### (Violation of REDA, N.C. Gen. Stat. § 95-241)

360.    The allegations of the previous paragraphs are realleged and incorporated herein by reference.

361.    Plaintiff engaged in protected activity when she complained about violations of the Occupational Safety and Health Act of North Carolina ("OSHA-NC"), N.C. Gen. Stat. § 95-126, *et. seq.*

362.    Upon information and belief, Defendant, including Fire Department management and senior City management knew about Plaintiff's protected activity as early as April 2014.

363.    Beginning in or about April 2014, Plaintiff in good faith expressed to management her concerns about health and safety issues of the property located at 1517 North Graham Street.

364.    On or about August 12, 2014, Plaintiff learned that Fire Department employees were working in the building at 1517 North Graham Street despite its condition and continued concerns about air quality.

365.    On or about August 14, 2014, Plaintiff complained to Council Member Fallon about the unsafe condition of the building where Fire Department employees were working, and about the mismanagement of funds. At that time, Council Member Fallon was the Chair of the Community Safety Committee, of which she remains a member.

366.    On or about September 25, 2014, Defendant terminated Plaintiff's employment.

67

367. The temporal proximity between Plaintiff's complaints and her termination strongly indicates that the decision to end her employment was retaliatory.

368. Defendant retaliated against Plaintiff because of her complaints of violations of OSHA-NC, N.C. Gen. Stat. § 95-126, *et. seq.*

369. The Fire Department's stated reason for terminating Plaintiff, that she violated its social media policy, is a pretext for its retaliation. Upon information and belief, no other Fire Department employees have been terminated for violating the social media policy; some have been disciplined but not terminated for more clearly offensive postings. Defendant would not have terminated Plaintiff but for her protected activity.

370. Defendant wrongfully retaliated against, and terminated Plaintiff for complaining about violations of OSHA-NC regarding health and safety issues.

371. Defendant's retaliation and termination of Plaintiff for her complaints of OSHA-NC violations is contrary to REDA, specifically N.C. Gen. Stat. § 95-241(a)(1)(b), which makes it unlawful for employers to discriminate or retaliate against an employee who in good faith does or threatens to file a claim or complaint, initiate an inquiry, investigation, inspection, proceeding or other action regarding OSHA-NC or exercises any right afforded by OSHA-NC.

372. As set forth above, on or about March 24, 2015, Plaintiff filed an Employment Discrimination Complaint Form with the NCDOL.

373. As set forth above, on or about January 21, 2016, the NCDOL issued Plaintiff a right-to-sue letter entitling her to commence this action within ninety (90) days of receipt of that notice.

374. As set forth above, Plaintiff has satisfied all private, administrative, and judicial prerequisites to institution of this action.

68

375.    As a result, Plaintiff is entitled to recover from Defendant general, special, compensatory, consequential, and treble damages in excess of twenty-five thousand dollars ($25,000.00) in an amount to be proven at trial; injunctive relief to enjoin continued violation of N.C. Gen. Stat. § 95-241; reinstatement to the same position held before the retaliatory action or discrimination or to an equivalent position; reinstatement of full fringe benefits and seniority rights; compensation for lost wages, lost benefits, and other economic losses that were proximately caused by the retaliatory action or discrimination; and reasonable costs and expenses, including attorney's fees pursuant to N.C. Gen. Stat. §§ 241 and 243.

**COUNT V**
**(Wrongful Discharge in Violation of Public Policy – the North Carolina Retaliatory Employment Discrimination Act, N.C. Gen. Stat. § 95-241(a)(1)(b) and the Occupational Safety and Health Act of North Carolina, N.C. Gen. Stat. § 95-126, *et. seq.*)**

376.    The allegations of the previous paragraphs are realleged and incorporated herein by reference.

377.    Plaintiff complained to Ray Eschert and Council Member Fallon, and provided information of the Fire Department's health and safety risks, failures to obtain required building permits and inspections, and financial mismanagement, each in reference to the building located at 1517 North Graham Street.

378.    Plaintiff's complaints to Ray Eschert and Council Member Fallon initiated an inquiry into, and investigation and inspection of, the building at 1517 North Graham Street and the Fire Department's health and safety violations under OSHA-NC.

379.    As set forth above, Plaintiff engaged in a protected activity when she exercised her right to complain, initiate an inquiry or investigation, and provide information to any person with respect to OSHA-NC, when she complained to Ray Eschert and Council Member Fallon, under N.C. Gen. Stat. § 95-241(a)(1)(b).

69

380.     The Fire Department management, the City, and members of City Council knew that Plaintiff had complained to Council Member Fallon when the City decided to terminate Plaintiff's employment.

381.     The Fire Department's stated reason for terminating Plaintiff's employment for violating its social media policy is a pretext for its actual decision to terminate Plaintiff in retaliation for her complaints.

382.     The Fire Department would not have terminated Plaintiff in the absence of her complaint she made and the information she provided to Ray Eschert and Council Member Fallon.

383.     In so acting, Defendant, through its employees and agents, either intended to cause or was recklessly indifferent to the likelihood that its conduct would cause severe emotional distress to Eschert.

384.     Defendant's conduct did in fact cause severe emotional distress to Plaintiff, including anxiety, mental anguish, and sleeplessness, for which she sought treatment.

385.     Defendant, through its employees and agents, retaliated against Eschert for raising complaints of Fire Department management creating risks to the health and safety of Fire Department employees in the Arson Task Force, and for raising complaints about Fire Department mismanagement by misusing and misallocating financial resources, and by failing to obtain required permits and inspections.

386.     Defendant, through its employees and agents, violated the public policy of North Carolina prohibiting retaliation against any employee who in good faith does or threatens to complain, initiate an inquiry, investigation, or inspection, or provides information to any person

with respect to OSHA-NC including violations of laws promoting health and safety in buildings and workspaces.

387.    Defendant's conduct, as described above, was without justification or excuse, was reprehensible, and occurred despite Plaintiff's continued efforts to prevent, halt, and reverse the retaliatory treatment of her because of her multiple complaints to Fire Department management and to Council Member Fallon about risks to the health and safety of Fire Department employees.

388.    As a direct and proximate result of Defendant's unlawful conduct, Plaintiff is now and will continue to be unlawfully deprived of income in the form of wages, compensation, and other monetary and non-monetary benefits due to her, in amounts to be proven at trial.

389.    As a result, Plaintiff is entitled to recover from Defendant damages in excess of twenty-five thousand dollars ($25,000.00) in an amount to be proven at trial, including consequential, general, special, compensatory, and liquidated damages; injunctive relief to deter similar misconduct in the future; back pay; front pay; damages for emotional distress; prejudgment interest; and the costs of this action.

## COUNT VI
### (Title VII, 42 U.S.C. § 2000e *et seq.* –
### Gender Discrimination and Retaliation against the City)

390.    The allegations of the previous paragraphs are realleged and incorporated herein by reference.

391.    Upon information and belief, as set forth above, additional male employees of the Fire Department have made other postings on Facebook and other social media websites that are more obviously offensive than those made by Eschert, and that are in clear and direct violation of

the Fire Department's social media policy, but who have not been terminated for making those posts.

392. Upon information and belief, as set forth above, the Fire Department selectively and severely enforced its social media policy against Plaintiff because she is female.

393. Upon information and belief, as set forth above, there is a widespread belief among members of the Fire Department that any action deemed undesirable by certain members of the command staff will result in targeting and retaliatory discipline.

394. Upon information and belief, as set forth above, Fire Department management targeted Plaintiff for retaliatory discipline because she was female and because she had complained about health and safety risks, and financial mismanagement, to Council Member Fallon.

395. As a result of this gender-selective and targeted retaliation, Eschert was disciplined and terminated because of her gender.

396. The Fire Department's conduct, as described above, was without justification or excuse; is reprehensible; and occurred despite Plaintiff's efforts to prevent, halt, and reverse the discrimination and retaliation.

397. As a result, Eschert is entitled to have and recover all damages resulting from the Fire Department's misconduct in an amount to be proven at trial, including compensatory, consequential, and liquidated damages; reinstatement; injunctive relief to deter similar misconduct in the future; prejudgment interest; reasonable attorney's fees; and the costs of this action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays the Court as follows:

1.      Pursuant to Count I (First Amendment Violation – The Complaints of Risks to Health and Safety and of Financial Mismanagement), that Plaintiff have and recover all damages including reinstatement, compensatory, back pay, front pay, benefits, costs of this action and attorney's fees, pursuant to 42 U.S.C. § 1988;

2.      Pursuant to Count II (First Amendment Violation – The Facebook Postings), that Plaintiff have and recover all damages including reinstatement, compensatory, back pay, front pay, benefits, costs of this action and attorney's fees, pursuant to 42 U.S.C. § 1988;

3.      Pursuant to Count III (Wrongful Discharge in Violation of Public Policy – North Carolina Constitution Article 1, §§ 1 and 14), that Plaintiff have and recover all damages from Defendant in an amount in excess of twenty-five thousand dollars ($25,000) in an amount to be proven at trial, including reinstatement; direct consequential, general, compensatory, special, and emotional distress damages; back pay; front pay; prejudgment interest; and the costs of this action;

4.      Pursuant to Count IV (Violation of REDA, N.C. Gen. Stat § 95-241), Plaintiff have and recover from Defendant general, special, compensatory, consequential, and treble damages in excess of twenty-five thousand dollars ($25,000.00) in an amount to be proven at trial; injunctive relief to enjoin continued violation of N.C. Gen. Stat. § 95-241; reinstatement to the same position held before the retaliatory action or discrimination or to an equivalent position; reinstatement of full fringe benefits and seniority rights; compensation for lost wages, lost benefits, and other economic losses that were proximately caused by the retaliatory action or

73

discrimination; and reasonable costs and expenses, including attorneys' fees pursuant to N.C. Gen. Stat §§ 95-241 and 243;

5.    Pursuant to Count V (Wrongful Discharge in Violation of Public Policy – the North Carolina Retaliatory Employment Discrimination Act, N.C. Gen. Stat. § 95-241(a)(1)(b) and the Occupational Safety and Health Act of North Carolina, N.C. Gen. Stat. § 95-126, et. seq.), that Plaintiff have and recover from Defendant damages in excess of twenty-five thousand dollars ($25,000.00) in an amount to be proven at trial, including consequential, general, special, compensatory, and liquidated damages; injunctive relief to deter similar misconduct in the future; back pay; front pay; damages for emotional distress; prejudgment interest; and the costs of this action;

6.    Pursuant to Count VI (Title VII, 42 U.S.C. § 2000e et seq. – Gender Discrimination and Retaliation Against the City), that Plaintiff have and recover damages in an amount to be proven at trial, including compensatory, consequential, and liquidated damages; reinstatement; injunctive relief to deter similar misconduct in the future; prejudgment interest; reasonable attorney's fees; and the costs of this action;

7.    That this matter be tried by a jury; and

8.    That the Court grant such other and further relief as this Court may deem just, proper, and equitable.

//

74

Respectfully submitted, this the 5th day of May, 2016.

MALONEY LAW & ASSOCIATES, PLLC

Margaret Behringer Maloney, N.C. Bar 13253
1824 E. Seventh Street
Charlotte, NC 28201
mmaloney@maloneylegal.com
Telephone: 704-632-1622
Facsimile: 704-632-1623
*Attorneys for Plaintiffs*

75

STATE OF NORTH CAROLINA

COUNTY OF MECKLENBURG

CRYSTAL ESCHERT,

     Plaintiff,

v.

CITY OF CHARLOTTE,

     Defendant.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
16-CVS-7034


**VERIFICATION**


STATE OF NORTH CAROLINA   )
                                   )
COUNTY OF MECKLENBURG    )

     BEFORE ME, the undersigned authorized authority, in and for said State and County, personally appeared Crystal Eschert, who is known to me, and who, being by me first duly sworn, deposes and says as follows: that the factual averments contained in the foregoing Verified Complaint are true and correct to the best of her knowledge, information and belief.

                                        _____
                                        Crystal Eschert

SWORN TO and subscribed before
me this 5th day of May, 2016

_____
NOTARY PUBLIC for the State of North Carolina

My commission expires: _____May 6, 2019_____

[SEAL]

76